Suri v Grey Global Group, Inc. (2018 NY Slip Op 05627)





Suri v Grey Global Group, Inc.


2018 NY Slip Op 05627


Decided on August 2, 2018


Appellate Division, First Department


Moulton, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 2, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Marcy L. Kahn
Cynthia S. Kern
Jeffrey K. Oing
Peter H. Moulton, JJ.


100846/11 5201 

[*1]Rachana Suri, Plaintiff-Appellant,
v
Grey Global Group, Inc., et al., Defendants-Respondents,



Plaintiffs appeals from the order of the Supreme Court, New York County (Donna M. Mills, J.), entered May 19, 2016, which, insofar as appealed from as limited by the briefs, granted defendants' motion for summary judgment dismissing the claims for employment discrimination, sexual harassment, and hostile work environment under the New York State and City Human Rights Laws.




Michael G. O'Neill, New York, for appellant.
Davis & Gilbert LLP, New York (Jessica Golden Cortes and Nirupama S. Hegde of counsel), for respondents.



MOULTON, J.


Plaintiff Rachana Suri brings this appeal after Supreme Court granted defendants' motion for summary judgment and dismissed her complaint in its entirety. Supreme Court correctly dismissed most of Suri's claims. However, it erred in dismissing Suri's claim that she was discriminated against because she rebuffed the sexual advance of Pasquale Cirullo, her immediate supervisor. Suri offers evidence that after this alleged incident Cirullo's behavior toward her turned from affable to malignant, and her workplace became a hostile environment. As discussed below, this evidence is sufficient to create a triable issue of fact concerning her gender discrimination claim under the City Human Rights Law.
We first summarize the claims that Supreme Court correctly found could not survive defendants' motion for summary judgment. We agree that Supreme Court properly dismissed Suri's claims that she was terminated from her employment on account of her gender or ethnicity [*2]in violation of the State and City Human Rights Laws. In response to defendants' assertion that Suri's position was eliminated and that she was terminated as part of a corporate reorganization and reduction in force, Suri pointed to no evidence showing that her termination was motivated by discrimination (see Cadet-Legros v New York Univ. Hosp. Ctr., 135 AD3d 196, 200 n 1, 202 [1st Dept 2015]; Bennett v Health Mgt. Sys., Inc., 92 AD3d 29, 41 [1st Dept 2011], lv denied 18 NY3d 811 [2012]). Suri's employer's decision to terminate her was not made by Cirullo, nor was it made in consultation with him. Suri's contention that she was replaced by two white men does not support her claim that her termination was discriminatory. The individuals that she identified performed duties that mostly did not overlap with hers.[FN1]
Supreme Court correctly rejected Suri's discrimination claim based on an alleged failure to promote her. While Cirullo was hired for a supervisory position to which Suri had also applied, she makes no showing that the decision was gender-based and all the record evidence is to the contrary.
In addition, we agree with Supreme Court that Suri did not point to any evidence that her employer discriminated against her because she was Indian. Cirullo's single, isolated comment that she had "dark" skin under the circumstances alleged was a "stray remark[]" that does not support an inference of discrimination (Hudson, 138 AD3d at 517; Melman v Montefiore Med. Ctr., 98 AD3d 107, 125 [1st Dept 2012]).
However, while Supreme Court properly dismissed Suri's gender discrimination claim under the State Human Rights Law, Supreme Court erred in dismissing Suri's claim under the more broadly protective City Human Rights Law (see Hernandez v Kaisman, 103 AD3d 106, 114 [1st Dept 2012]). Suri offers evidence that Cirullo used his position to implicitly demand sexual favors, and, when she rebuffed him, to explicitly make her life miserable for the next 18 months. By this evidence Suri demonstrated that there are triable issues of fact concerning her claim under Administrative Code of City of NY § 8-107(1)(a).
Suri states that she began reporting to Cirullo in October 2008. She asserts that on Cirullo's first day as Senior Vice President, he walked into her office and told her she had beautiful hair. The next day he told her that she had really nice boots. Suri claims that about one week later, when she sat next to Cirullo at a meeting, he put his hand on her thigh, close to her knee, and squeezed lightly for a few seconds. Suri explains that she immediately moved away. She understood Cirullo's behavior as a sexual overture.
After this meeting, Suri claims that Cirullo's behavior towards her changed. According to Suri he dismissed her work; talked over her; put his hand in her face when she was talking; criticized, belittled and mocked her in front of other employees; cut her out of meetings; withheld resources; and delayed one of her projects. For the last six months of her employment, Cirullo stopped talking to her, even though he sat next to her. She also maintains that because Cirullo mistreated her, other employees followed along believing that it was permissible to disrespect her.
Suri explains that she only complained about the overture to her friends. However, she complained to the Executive Vice President in March 2009 that Cirullo cut her out of meetings. According to Suri, after the Executive Vice President intervened, Cirullo briefly relented and invited her to a few meetings. However, Cirullo soon resumed cutting her out of meetings and emails. Suri maintains that after she objected, Cirullo gave her the task of setting up the very same meetings to which she was not invited. In May or June 2009, Suri states that she complained to the human resources manager that Cirullo pulled her on and off projects and left her with no resources on one project. According to Suri, the human resources manager responded "that that's how men are and we have to tiptoe around their egos and this is a male-dominated world and we already know we work twice as hard as they do with less pay." As a result of this complaint, Suri explains that the manager requested that Cirullo create a new job description for her. Cirullo did so, but three days after the complaint, he removed her from a project.
Suri claims that as a result of the treatment inflicted by Cirullo and his followers, she developed gastrointestinal problems, lost significant weight, and required mental health counseling.
Cirullo denies complimenting Suri's appearance and squeezing her leg. He also contends that he treated all of his direct reports the same way and that, at worst, the behavior alleged by Suri just paints a portrait of a bad manager. Cirullo also maintains that even if Suri's allegations are true, the incidents amount to nothing more than petty slights or trivial inconveniences. Cirullo also takes issue with Suri's characterization of his hostility towards her, pointing to emails as evidence that they had a cordial relationship. He also maintains that she was too sensitive to her colleagues' tone, and attributed that sensitivity to her family issues.
The City Human Rights Law
The City Human Rights Law is codified in title 8 of the Administrative Code (§ 8-101 et seq.). As is relevant to this action, Administrative Code § 8-107(1)(a) prohibits "[u]nlawful discriminatory practices" and provides that it is unlawful:
"(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service or alienage or citizenship status of any person:
"(1) To represent that any employment or position is not available when in fact it is available;
"(2) To refuse to hire or employ or to bar or to discharge from employment such person; or
"(3) To discriminate against such person in compensation or in terms, conditions or privileges of employment" (Administrative Code § 8-107{1}[a][1], [2], [3]).
In 2005, the City Council passed the Local Civil Rights Restoration Act of 2005 (Local Law No. 85 [2005] of City of NY § 1), finding that the provisions of the City Human Rights Law had been "construed too narrowly to ensure protection of the civil rights of all persons covered by the law." The Restoration Act revised the City Human Rights Law (Administrative Code § 8-130[a]) to state:
"The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions worded [*3]comparably to provisions of this title, have been so construed."
In Williams v New York City Hous. Auth., in an opinion by Justice Acosta, we found that "the text and legislative history [of the Restoration Act] represent a desire that the City HRL meld the broadest vision of social justice with the strongest law enforcement deterrent" (61 AD3d 62, 68 [1st Dept 2009] [internal quotation marks omitted], lv denied 13 NY3d 702 [2009]). The Court of Appeals has also emphasized that all provisions of the City Human Rights Law should be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477-478 [2011]).
In Williams we also dispensed with the need for much of the nomenclature that has accreted over the years in gender discrimination jurisprudence, such as "sexual harassment" and "quid pro quo," and instead focused on "the existence of differential treatment" in connection with "unwanted gender-based conduct" (Williams, 61 AD3d at 75, 76). We explained:
"Despite the popular notion that sex discrimination' and sexual harassment' are two distinct things, it is, of course, the case that the latter is one species of sex- or gender-based discrimination. There is no sexual harassment provision' of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender" (id. at 75).
Thus, to establish a gender discrimination claim under the City Human Rights Law, a plaintiff need only demonstrate "by a preponderance of the evidence that she has been treated less well than other employees because of her gender" (id. at 78)[FN2]. We also found that the federal and state law, limiting actionable sexual harassment to "severe or pervasive" conduct, was not appropriate for the broader and more remedial City Human Rights Law (id. at 75-81). Instead, we recognized an affirmative defense whereby defendants can avoid liability if the conduct amounted to nothing more than what a reasonable victim of discrimination would consider "petty [*4]slights and trivial inconveniences" (id. at 80).[FN3]
In our view, the dissent's approach does not serve the broad remedial purpose of the City Human Rights Law. The dissent errs in parsing Suri's third cause of action into two claims: hostile work environment and sexual harassment, and then separately analyzing each claim as if they were unrelated. The dissent concludes that Cirullo's and Suri's coworkers' alleged mistreatment of her over an 18-month period far exceeded "petty slights." Nevertheless, the hostile work environment claim fails, the dissent concludes, because there is no evidence that the mistreatment was sexually motivated. In doing so, the dissent disregards Cirullo's alleged sexual overture (which is analyzed separately) and the temporal proximity between the alleged overture and the alleged 18-month period of mistreatment.
The dissent separately analyzes Cirullo's alleged overture as a sexual harassment claim, rejecting Suri's argument that it should be considered in connection with the 18-month period of mistreatment that followed. The dissent concludes that unlike the behavior over the 18-month period, the two compliments and the thigh squeeze amounted to nothing more than "petty slights." This conclusion is built upon the dissent's finding that Suri did not produce "some evidence" sufficient to raise an issue of fact as to whether Cirullo suggested a sexual relationship. In doing so, however, the dissent discounts Suri's own testimony.
The dissent erroneously rejects Suri's argument that her claim should be viewed holistically, finding that to do so improperly conflates or resurrects Suri's claims. The City Human Rights Law speaks to unequal treatment and does not distinguish between sexual harassment and hostile work environment. It contains no prohibition on conflating claims [FN4]. Rather the "overall context in which [the challenged conduct occurs] cannot be ignored" (Hernandez, 103 AD3d at 115).
Viewing the claim holistically, as we must, defendants are not entitled to summary judgment under the City Human Rights Law. The jury must decide whether Cirullo made a sexual overture, and whether Cirullo created a hostile work environment because Suri rebuffed that overture [FN5]. Sexual advances are not always made explicitly. The absence of evidence of a [*5]supervisor's direct pressure for sexual favors as a condition of employment does not negate indirect pressure or doom the claim (see Gallagher v Delaney, 139 F3d 338, 346 [2d Cir 1998] [jury must decide whether the plaintiff experienced a hostile work environment in violation of federal and state law where the plaintiff's supervisor never directly asked her to engage in sexual relations and never specifically conditioned her employment on accepting his gifts, offers, and signs of affection]).
Admittedly, that Cirullo did not expressly demand sex or engage in sexually charged conversations makes the facts of this case more equivocal than those of some of our precedents. However, "[i]t is not the province of the court itself to decide what inferences should be drawn . . .; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper" (Vivenzio v City of Syracuse, 611 F3d 98, 106 [2d Cir 2010] [internal quotation marks omitted]).
It is a jury's function to determine what happened between Cirullo and Suri, and whether it amounted to gender discrimination. If it credits plaintiff's account of two "compliments" followed within approximately one week by her supervisor's palm on her thigh, and her description of how her treatment at the workplace deteriorated in the wake of these incidents, then a jury could find that such behavior did not constitute "petty slights or trivial inconveniences" (Williams at 80; compare Ji Sun Jennifer Kim v Goldberg, Weprin, Finkel, Goldstein, LLP, 120 AD3d 18, 25 [1st Dept 2014]).
Thus, in our view, Suri sufficiently raises an issue of fact as to whether she was "treated less well than other employees because of her gender" (Williams, 61 AD3d at 78) in violation of Administrative Code § 8-107(1)(a).
The Bennett Burden-Shifting Framework
While we agree with the dissent's application of this framework to the wrongful termination and failure to promote aspects of Suri's claim under the City Human Rights Law (see Bennett, 92 AD3d at 29; see also Watson v Emblem Health Servs., 158 AD3d 179 [1st Dept 2018]; Hudson v Merrill Lynch & Co., 138 AD3d at 511), burden-shifting analysis does not apply to Suri's claim that Cirullo tacitly sought sexual favors from her, and treated her as a pariah for the next 18 months after she rebuffed him.[FN6]
The dissent cites to three of our prior decisions in order to buttress the position that the Bennett burden-shifting test applies to this claim (see Arifi v Central Moving & Stor. Co., Inc., 147 AD3d 551 [1st Dept 2017]; Kim, 120 AD3d at 18; Chin v New York City Hous. Auth., 106 AD3d 443 [1st Dept 2013], lv denied 22 NY3d 861 [2014]). The dissent's reliance on these three cases is misplaced.
In both Arifi and Kim, we did not apply the Bennett burden-shifting analysis to the plaintiffs' hostile work environment claims under the City Human Rights Law, although we applied the test to the plaintiffs' termination claims (Arifi, 147 AD3d at 551; Kim, 120 AD3d at 26). Our disagreement with the dissent, however, is not with the application of the Bennett burden-shifting test to Suri's termination or failure to promote claims. Rather, it is with respect to the application of the Bennett test to Suri's claim that she suffered a hostile work environment as the result of rejecting Cirullo's alleged sexual advance.
In Arifi, the plaintiff's hostile work environment claim failed because the plaintiff did not demonstrate that age discrimination was one of the motivating factors for the employer's hostile conduct (Arifi, 147 AD3d at 551). In Kim, the plaintiff's hostile work environment claim failed because the conduct at issue amounted to nothing more than "petty slights and trivial inconveniences" (Kim, 120 AD3d at 26 [internal quotation marks omitted]). Similarly, in Chin, the plaintiff's hostile work environment claim failed for reasons unrelated to the Bennett burden-shifting test - a test that was not applied to that claim. Although we applied the Bennett burden-shifting test in Chin to the plaintiff's failure to promote claim, the plaintiff's hostile work environment claim failed because the plaintiff did not demonstrate that she was treated less well than other employees because of her protected status or that discrimination was one of the motivating factors for the defendant's conduct (Chin, 106 AD3d at 444-445).
In our view, the dissent mistakenly applies the Bennett burden-shifting test to Suri's claim that Cirullo tacitly sought sexual favors from her, and mistreated her after she rebuffed him. In Bennett we weighed the applicability of the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v Green (411 US 792 [1973]) to a summary judgment motion under the City Human Rights Law, where a plaintiff alleged wrongful termination [FN7]. We concluded [*6]that:
"[o]n a motion for summary judgment, defendant bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the McDonnell Douglas test, or as one of a number of mixed motives, by direct or circumstantial evidence" (Bennett, 92 AD3d at 41).[FN8]
Although we noted that a central purpose of the City Human Rights Law "was to resist efforts to ratchet down or devalue the means by which those intended to be protected by the City [Human Rights Law] could be most strongly protected" and "[t]hese concerns warrant the strongest possible safeguards against depriving an alleged victim of discrimination of a full and fair hearing before a jury of her peers by means of summary judgment," we nevertheless found that the defendants were properly granted summary judgment (id. at 44). We found that the employer justified its "adverse action" of termination because the plaintiff put forth no evidence that the defendants' explanations for terminating him were pretextual, or any evidence of a mixed motive.[FN9]
Notably, however, Bennett did not involve a claim for differential treatment resulting in a hostile environment. Our post-Williams cases demonstrate that courts should not automatically apply the Bennett burden-shifting framework to every aspect of a plaintiff's City Human Rights Law claim (see e.g. Kim, 120 AD3d at 18). In Kim, we applied the Bennett framework to a plaintiff's claim that she was terminated in retaliation for engaging in a protected activity, and we found triable issues of fact as to whether the employer's workforce reduction was a pretext for that termination (see id. at 25). However, in Kim we did not apply burden-shifting to that aspect of the plaintiff's claim arising out of a hostile workplace (id. at 26). Instead, we focused on whether a reasonable person would consider the conduct nothing more than petty slights and trivial inconveniences (id. at 26). We found that the claim, arising from one inappropriate gender-based comment and a reprimand for reading a book, should be dismissed because a [*7]reasonable person would consider the conduct nothing more than petty slights and trivial inconveniences (id.). Similarly, in Hernandez (103 AD3d at 106), where the issue of termination was not before us, we did not apply the Bennett test in concluding that summary judgment should be denied under the City Human Rights Law based on comments and emails which objectified women's bodies. Instead, we considered the totality of the circumstances, and, using a reasonable person standard, determined whether the behavior fell within the broad range of conduct between severe and pervasive on the one hand and petty slight or trivial inconvenience on the other (see Hernandez, 103 AD3d at 114-115 [internal quotation marks omitted]).[FN10]
In addition to the fact that cases such as Kim and Hernandez have not applied the Bennett burden-shifting framework to every aspect of a gender discrimination claim, we find the reasoning in Mihalik v Credit Agricole Cheuvreux N.A., Inc. (715 F3d 102 [2d Cir 2013]) persuasive. In that case, the Second Circuit analyzed a plaintiff's claim of gender discrimination and retaliation under the City Human Rights Law (id. at 107). The plaintiff alleged that she was subjected to suggestive comments and was propositioned for sex. After she refused her CEO's advances, she claimed that the CEO retaliated by excluding her from meetings, berating her in front of other employees, criticizing her work, and ultimately firing her (id. at 106-108).
In reversing the District Court's grant of summary judgment to the defendants, the Second Circuit criticized the District Court for considering the plaintiff's gender discrimination claim under a quid pro quo analysis and hostile work environment analysis (id. at 114). Under the City Human Rights Law, the Second Circuit observed, differential treatment may be actionable even where the treatment does not result in an employee's discharge. Williams made clear that the City Human Rights Law focuses on unequal treatment regardless of whether the conduct is "tangible" like hiring or firing (id.). Thus, even assuming that a plaintiff could not prove that she was dismissed for a discriminatory reason, she could still recover for other differential treatment based on her gender (id.). Notably, the Second Circuit observed that "[e]ven a poorly-performing employee is entitled to an environment free from sexual harassment" and that poor performance would not excuse alleged sexual advances and demeaning behavior (id.).
Therefore, while the Second Circuit applied the Bennett burden-shifting test to that part of the claim alleging wrongful termination, it declined to apply the framework to the alleged sexual advances and subsequent demeaning conduct (id.). Instead, drawing all reasonable inferences in the plaintiff's favor, the Second Circuit found that it could not conclude, as a matter of law, that there was no causal connection between the rejections of sexual advances and the supervisor's subsequent demeaning conduct.
Similarly, viewing the evidence in a light most favorable to Suri, we cannot conclude as a matter of law that Cirullo did not tacitly condition the terms, conditions or privileges of Suri's employment on submission to his alleged sexual overture and thereafter create a hostile work [*8]environment after she rejected him. That behavior would not be petty or trivial. Issues of fact exist for the jury as to whether Suri was treated less well because of her gender, in violation of Administrative Code § 8-107(1)(a).
Accordingly, the order of the Supreme Court, New York County (Donna M. Mills, J.), entered May 19, 2016, which, insofar as appealed from as limited by the briefs, granted defendants' motion for summary judgment dismissing the claims for employment discrimination, sexual harassment, and hostile work environment under the New York State and City Human Rights Laws, should be modified, on the law, to deny the motion as to plaintiff's claim under the City Human Rights Law in connection with her assertion that she rejected her supervisor's sexual overture and as a result he subjected her to a hostile work environment, and otherwise affirmed, without costs.
All concur except Friedman, JP. and Kahn J. who dissent in part in an opinion by Kahn, J.




KAHN, J. (dissenting in part)


I would affirm the order of the Supreme Court in all respects. In my view, plaintiff has failed to proffer evidence sufficient to raise an issue of fact as to whether those actions allegedly taken by defendants that form the basis of plaintiff's claims of hostile work environment and disparate treatment under the New York City Human Rights Law (Administrative Code of City of NY § 8-107[1][a]) (City HRL) were motivated by gender, race or ethnicity discrimination. With regard to plaintiff's conclusory allegations of two incidents of defendant Cirullo's complimenting her on her appearance and one incident of touching, while I believe that the behavior described in these alleged incidents is certainly inappropriate, I also believe that these incidents do not raise any issue of fact sufficient to defeat defendants' motion for summary judgment as to plaintiff's City HRL sexual harassment claim. Furthermore, I do not agree with the majority that three of plaintiff's retaliation claims (claims four, seven and eight), which she abandoned before the motion court and does not raise before us, also allege separable claims of hostile work environment and disparate treatment and, to that extent, should survive defendants' summary judgment motion. I do agree with the majority, however, that the remainder of plaintiff's claims were properly dismissed. I therefore respectfully dissent in part, as detailed below.
I. Statement of Facts
Except where indicated otherwise, the following facts are uncontested. Defendant Grey Global Group, Inc. is a global advertising and marketing agency. Plaintiff Rachana Suri, who identifies herself as a "brown skinned woman of Indian descent," was employed by Grey from June 2004 until her termination on April 27, 2010. Defendant Pasquale Cirullo was employed by Grey beginning in March 2008 and, in September 2008, became plaintiff's supervisor.
Plaintiff began working for Grey in June 2004 as a business analyst in its Financial Services Department at an annual salary of $70,000. She subsequently received several promotions and salary increases. In September 2005, she was promoted to Financial Manager at an annual salary of $85,000. In November 2006, her annual salary increased to $89,000. In January 2007, she was moved into Grey's Information Technology (IT) Department and promoted to Director.
In March 2008, plaintiff was invited to interview and apply for the position of Project Manager of the Donovan Data Systems (DDS) financial data management system which was to be implemented by Grey. Plaintiff was interviewed by John Grudzina, who was then Grey's [*9]Executive Vice President, General Counsel and Chief of Staff. He did not offer her the position, however, but instead offered it to Cirullo. According to Grudzina, his reasons for hiring Cirullo were that he was "very knowledgeable about the DDS system," "came very highly recommended" and "was directly involved in the negotiation of the DDS system."
One month later, in April 2008, plaintiff was again promoted, this time to the position of Vice President, which office she held until her termination, and her annual salary again increased, this time to $105,000. In July 2008, her annual salary was raised to $115,000 and remained at that amount until her termination in April 2010.
On September 1, 2008, Cirullo was promoted to Senior Vice President and Director of Business Systems and thereafter became plaintiff's supervisor. According to plaintiff, on Cirullo's first day as Senior Vice President and as her supervisor, he entered her office and, after a 5- to 10-minute work discussion, Cirullo told plaintiff that she had beautiful hair. The following day, Cirullo came into her office again and told her that she had nice boots.
According to plaintiff, in November 2008,[FN1] she and Cirullo attended a meeting with about six representatives of DDS. At the beginning of the meeting, while plaintiff was seated at a conference table with Cirullo seated directly to her right, Cirullo touched plaintiff's thigh, near her knee. He lightly squeezed her thigh for "[m]aybe a second or two." He did not caress her leg or otherwise move his hand on her leg, and he did not look at her or say anything. She immediately moved her chair away from him and made no eye contact with him throughout the two-hour meeting. Plaintiff interpreted Cirullo's touching her as a sexual overture, especially in light of his previous comments about her hair and boots.
Plaintiff has testified that the evening after the touching incident, she spoke about the incident with a friend who did not work at Grey, in the presence of her friend's boyfriend. That friend, in turn, introduced plaintiff to a person who worked in human resources at the United Nations, with whom plaintiff also discussed the incident. She has further stated that she also spoke about the incident with another close friend and confidant who is now deceased. Plaintiff has also stated that she eventually spoke to her parents about what had occurred that day. None of these individuals provided confirmation of such reports on the record before us, however. Plaintiff neither discussed the incident with Cirullo at any time nor reported it to anyone else at Grey. As plaintiff acknowledges, Cirullo never touched her again, and never made any sexual comments to her. In his own testimony, Cirullo denied that he touched plaintiff at any meeting, and did not recall giving her any compliments about her appearance, although he conceded that he may have done so.
According to plaintiff, over the course of the next 18 months, from November 2008 to April 2010, "Cirullo made my life at Grey miserable" in the following respects. Cirullo had been "very nice and outgoing" before the touching incident, but became distant and less communicative afterward. He also subjected her to a barrage of demeaning and negative treatment. Cirullo dismissed her work and her ideas. He talked over her, scoffed at her comments at meetings, publicly criticized her ideas, excluded her from meetings that she had arranged for him and invaded her privacy by snooping on her computer. Because Cirullo "set the tone" in her department, its other employees, who had previously respected her, felt at liberty to disrespect her. She experienced disrespectful treatment not only from her fellow Vice Presidents at Grey, but also from Grey employees who held a lower-level position than her own. In [*10]addition, Cirullo stole many of her ideas and presented them as his own, took her on and off projects at will and threatened to harm her career if she did not comply with his directives. Cirullo eventually removed her from important projects and stopped talking to her altogether.
According to Michael Yarcheski, a colleague of plaintiff's at Grey, however, he had attended "[q]uite a few" meetings with plaintiff and Cirullo and observed that Cirullo was "cordial to her." According to plaintiff, she complained to Mandy Preville Wellington, a former Grey employee who then worked in Grey's human resources department, "maybe ten times" in 2009 about the mistreatment she was receiving from Cirullo at Grey. Plaintiff has stated that she spoke to Wellington as a personal friend and not in her capacity as a Grey human resources employee, and does not believe that any formal report of her complaints was made by Grey's human resources department as a result of her conversations with Wellington. Wellington testified, however, that she does not recall plaintiff ever speaking to her about being mistreated or treated differently by Cirullo or any other Grey employees, however. Moreover, a series of email messages between Cirullo and plaintiff indicates a cordial relationship between the two of them, although plaintiff discounts the email messages as not representative of their relationship.
Cirullo further testified that plaintiff was not the only Grey employee reporting to him that he put on and took off projects, and that he also did this with other employees, male and female, when they had completed one aspect of a given project and when he thought that they would make a valuable contribution to a given aspect of another project. He also stated that he reassigned plaintiff at times when plaintiff's knowledge was redundant of that of other employees who were also working on the same project and that he thought that her time would be better spent on other projects.
According to plaintiff, Doug Livingston, who at the time was head of the special projects group and who worked on a project with plaintiff but was not her supervisor, also belittled her, and talked over and disagreed with her at meetings.
Plaintiff maintains that in March 2009 she complained to Grudzina about Cirullo. Although plaintiff has not specified the nature of her March 2009 complaint, she has testified that, on an unspecified date, she went to Grudzina and told him that Cirullo wasn't inviting her to meetings, to which Grudzina responded that he would talk to Cirullo. According to plaintiff, after she complained to Grudzina, Cirullo invited her to two or three meetings but then excluded her from meetings once again.
In May 2009, plaintiff made a formal complaint to a female manager of Grey's human resources department, who was neither plaintiff's manager nor her supervisor, about being mistreated and disrespected by Cirullo and Livingston. She accused Cirullo of asking her to perform such tasks as sending out electronic meeting notices on his behalf, denying her the resources she needed to do her work and giving her no idea of what was expected of her. According to plaintiff, the human resources department manager's responses to her complaints were that "that's how men are," "this is a male-dominated world" and that women "work twice as hard as [men] do with less pay." Three days after her complaint to the human resources department manager, Cirullo removed her from a work project to which she had been assigned six weeks earlier. She then complained to Grudzina and the human resources department manager about being removed from the project and was told that her removal was Cirullo's decision to make.
Cirullo testified that, to the extent that plaintiff's complaint about lack of resources referred to her assigned task of training Grey's clients to use a computerized document repository system, with the exception of one other Grey employee with whom plaintiff was working at the time, she was the sole resource, as she and her coworker were the only ones trained to use the system and the only ones who could train others to use it.
After plaintiff's May 2009 meeting with the human resources department manager, Cirullo met with the same manager, who told him about plaintiff's complaint about not knowing what was expected of her. The manager suggested that Cirullo prepare a job description for plaintiff. Cirullo did so, and met with plaintiff to review the job description with her and to give her an outline of her responsibilities. According to Cirullo, plaintiff raised no objections or questions with regard to designated responsibilities and did not tell Cirullo that she needed any [*11]further resources to complete her designated tasks.
According to plaintiff, in October 2009, during a "terrorist alert day," she was pulled off the subway and searched, causing her to be late for a meeting at work. When she arrived at work, Cirullo commented that she should expect to be searched because she was "dark." Cirullo denied making any such comment.
In January 2010, Robert Walsh was hired as Grey's Chief Information Officer while the offices of other subsidiaries of WPP Group PLC, Grey's parent company, were being consolidated with Grey. Walsh was given the responsibility of determining how to consolidate the IT teams of the various WPP companies into one shared service, thereby eliminating overlap and duplication of resources and staff. The Grey IT Department consisted of several teams, including the Business Systems group, of which Cirullo was the Project Director and plaintiff the Project Manager. At the time, 10 to 15 employees worked in the Business Systems group. Pursuant to the consolidation effort, 13 Grey IT Department employees, including plaintiff, were dismissed as the result of reductions in force in February, April and May 2010. All of the terminated IT Department employees other than plaintiff were men, and included Caucasians, Asians and Latinos. Plaintiff was the only woman in the Business Systems group and was the only person in that group who was selected for termination in the course of the reductions in force.
Walsh testified that he decided to terminate plaintiff's employment without consulting Cirullo because he realized that she was working only on a single project and that the company needed to cut costs. He further testified that he did not know much about the quality of her job performance, but thought that, although she was capable of handling more work, she was not working at full capacity. He further observed that she was not asking to take on more work and did not seem like a "go-getter." Walsh included plaintiff in his list of employees to be terminated in the first round of layoffs in February 2010, but Cirullo urged him to defer her termination until April 2010 to allow her more time to finish her assigned tasks and to attempt to complete the one project on which she was working at the time. On the day of her termination, she was working on one aspect of one project but could not complete it that day. According to Cirullo, plaintiff was not replaced and no one took over her assignment after her dismissal.
After plaintiff's departure, Walsh hired two Caucasian men. According to Walsh, one of those two men, who had worked at a WPP subsidiary other than Grey, had been transferred to Grey by Walsh to perform work comparable to that performed by Cirullo. That man was placed in charge of oversight of Business Systems, a responsibility which plaintiff had not had while employed at Grey. The other of the two men, who had worked at yet another WPP subsidiary, was transferred to Grey by Walsh in May 2010 to "fix" the DDS system. That man replaced Cirullo as DDS Project Manager after Walsh's termination of Cirullo, which occurred in December 2010.
In January 2011, plaintiff commenced the instant action, alleging employment discrimination based on her gender, race and/or ethnicity in violation of the State and City HRLs, including claims for wrongful termination (claims nine and ten), failure to promote (claims one and two) and disparate treatment (claims five and six). Plaintiff also advanced a claim of creating a sexually, racially and/or ethnically hostile work environment and sexual harassment in violation of the City HRL (claim three). Defendants subsequently moved successfully for summary judgment dismissing all of plaintiff's claims.
II. Legal Standards
A. City HRL
The Court of Appeals has instructed that the City HRL must be "construe[d] . . . broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477—478 [2011]; see Administrative Code § 8-130[a] ["The [City HRL] shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws . . . have been so construed"]; Administrative Code § 8-130[c] ["Cases that have correctly understood and analyzed the liberal construction requirement of subdivision a of this section and that have developed legal doctrines accordingly that reflect the broad and [*12]remedial purposes of [the City HRL] include [Albunio] . . ., [Bennett v Health Mgt. Sys., Inc., 92 AD3d 29 (1st Dept 2011), lv denied 18 NY3d 811 (2012)] . . . and the majority opinion in [Williams v New York City Hous. Auth., 61 AD3d 62 (1st Dept 2009), lv denied 13 NY3d 702 (2009)]"]).
In order to succeed on a motion for summary judgment dismissing City HRL employment discrimination claims of wrongful termination, failure to promote and disparate treatment, the moving defendant must establish that the evidence, viewed in the light most favorable to the plaintiff, shows that no reasonable jury could find the defendant liable "under any of the evidentiary routes," including the McDonnell Douglas framework (see McDonnell Douglas Corp. v Green, 411 US 792, 802 [1973]) and the "mixed motive" framework (see Williams, 61 AD3d at 78 n 27), "by direct or circumstantial evidence" (Bennett, 92 AD3d at 41).
With respect to City HRL employment discrimination claims, as our Court has explained:
"Under the McDonnell Douglas framework, a plaintiff asserting a claim of employment discrimination bears the initial burden of establishing a prima facie case, by showing that she is a member of a protected class, she was qualified to hold the position, and that she suffered adverse employment action under circumstances giving rise to an inference of discrimination. If the plaintiff makes such a showing, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the employment decision. If the employer succeeds in doing so, the burden then shifts back to the plaintiff to prove that the reason proffered by the employer was merely a pretext for discrimination" (Hudson v Merrill Lynch & Co., Inc., 138 AD3d 511, 514 [1st Dept 2016], lv denied 28 NY3d 902 [2016] [internal citations omitted]).
With respect to a claim of violation of the City HRL, we have cautioned:
"[The defendant's] explanatory second set of facts. . . should not be relied on to negate the
plaintiff's prima facie case in the first instance,
but rather, seen as either: (a) the defendant's
articulation through competent evidence of
nondiscriminatory reasons for its action (stage two
in the McDonnell Douglas framework); or (b) part of
the defendant's ultimate effort to undercut the weight assigned to the plaintiff's evidence and thus disprove
the plaintiff's claim that it was more likely than not
that discrimination played a role in defendant's
actions" (Bennett, 92 AD3d at 37).
Under the "mixed motive" framework, the first two stages of the three-stage burden-shifting framework are the same as those of McDonnell Douglas, but the plaintiff's burden of proof in the third stage is lessened. In a "mixed motive" analysis, "[t]he question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for the defendant's conduct" (Williams, 61 AD3d at 78 n 27). Under this framework, "the employer's production of evidence of a legitimate reason for the challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the [adverse employment] action was motivated at least in part by discrimination" (Melman v Montefiore Med. Ctr., 98 AD3d 107, 127 [1st Dept 2012][internal quotation marks omitted]).
Under both the McDonnell Douglas and "mixed motive" frameworks, however, on a claim of employment discrimination under the City HRL, once the defendant has proffered nondiscriminatory reasons for the challenged action, "the plaintiff may not stand silent" (Bennett, 92 AD3d at 39). Rather, "[t]he plaintiff must either counter the defendant's evidence by producing pretext evidence (or otherwise), or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by discrimination" (id.). That burden may be satisfied by the plaintiff's offering of "some evidence that at least one of the [*13]reasons proffered by defendant is false, misleading, or incomplete" (Cadet-Legros v New York Univ. Hosp. Ctr., 135 AD3d 196, 200 [1st Dept 2015] [internal quotation marks omitted]). Only under "rare and unusual" circumstances should the defendant's production of evidence of a nondiscriminatory motive prompt the court to return to the question of whether the plaintiff made out a prima facie case for discrimination in the first instance (Bennett, 92 AD3d at 40).
On a claim of sexually hostile work environment in violation of the City HRL, a plaintiff must establish that she was " treated less well than other employees because of her gender'" (Short v Deutsche Bank Sec., Inc., 79 AD3d 503, 505-506 [1st Dept 2010], quoting Williams, 61 AD3d at 78). Such a claim may be dismissed only if the claim amounts to the "truly insubstantial case" in which the "defendant's behavior cannot be said to fall within the broad range of conduct that falls between "severe and pervasive" on the one hand and a "petty slight or trivial inconvenience" on the other'" (Hernandez v Kaisman, 103 AD3d 106, 114-115 [1st Dept 2012], quoting Williams, 61 AD3d at 80).
Although claims of hostile work environment in violation of the City HRL are to be liberally construed in the plaintiff's favor, the City HRL is not a "general civility code" (Williams, 61 AD3d at 79 [internal quotation marks omitted]). Accordingly, in order for such a claim to survive a summary judgment motion, the plaintiff must proffer "some evidence" that the defendant's adverse conduct toward the plaintiff had a discriminatory motive (see Cadet-Legros at 200; Bennett at 45).
Claims of sexual harassment under the City HRL are based upon allegations of "unwelcome sexual conduct — whether sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature" (Matter of Father Belle Community Ctr. v New York State Div. of Human Rights, 221 AD2d 44, 50 [4th Dept 1996], lv denied 89 NY2d 809 [1997] [addressing State HRL claims]). The City HRL does not differentiate sexual harassment from other forms of gender discrimination, however. Indeed, as we have explained in Williams, the City HRL has no express provision for sexual harassment claims at all (see Williams at 75 ["There is no sexual harassment provision' of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender"]). Rather, in City HRL analysis, "sexual harassment" is viewed as "one species of sex- or gender-based discrimination" (id.). However, our jurisprudence offers no basis for any departure from the Father Belle definition in identifying sexually harassing behavior. In short, sexual harassment under the City HRL involves unwelcome verbal or physical conduct of a sexual nature.
Thus, as we have stated in Williams, "the primary issue . . . in harassment cases, as in other terms and conditions cases, is whether the plaintiff . . . has been treated less well than other employees because of her gender" (Williams, 61 AD3d at 78). We have further observed that "[a]t the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred" (id.). While a plaintiff need not demonstrate that the incidents of an employer's unwelcome sexual conduct were "severe and pervasive" in order to establish an actionable claim of sexual harassment under the City HRL, summary dismissal of a City HRL sexual harassment claim is available to employers in "truly insubstantial cases" where "the alleged discriminatory conduct in question . . . could only be reasonably interpreted . . . as representing no more than petty slights or trivial inconveniences" (id. at 80).
With regard to the circumstances under which a corporate employer may be held vicariously liable for the discriminatory acts of its employees, the "City HRL imposes strict liability on employers for the acts of managers and supervisors . . . where . . . the offending employee exercised managerial or supervisory responsibility'" (McRedmond v Sutton Place Rest. & Bar, Inc., 95 AD3d 671, 673 [1st Dept 2012], quoting Zakrzewska v New School, 14 NY3d 469, 479 [2010], quoting Administrative Code § 8-107[13][b][1]).
B. State HRL
This Court's summary judgment review of State HRL employment discrimination claims is limited to McDonnell Douglas analysis under binding Court of Appeals precedent (see Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305 [2004] [setting forth McDonnell Douglas [*14]framework only]; Fletcher v Dakota, Inc., 99 AD3d 43, 52 n 2 [1st Dept 2012] ["While we rely upon Forrest in addressing plaintiff's State HRL claim (because that case continues to be binding upon us in the context of State HRL claims), we do not rely upon Forrest with respect to plaintiff's City HRL claim"]).
III. Discussion
Plaintiff has delineated her claims of gender and race/ethnicity employment discrimination as wrongful termination (claims nine and ten), failure to promote (claims one and two) and disparate treatment (claims five and six) in violation of both the City and State HRLs. In addition, she advances a claim of creation of a sexually, racially and/or ethnically hostile work environment in violation of the City HRL and an apparent claim of sexual harassment in violation of the City HRL (claim three). Hence, I will address plaintiff's claims as so delineated.
At the outset, in order to determine whether plaintiff's claims were properly dismissed, a review of these claims under a combined McDonnell Douglas and "mixed motive" evidentiary framework analysis is consistent with our precedent (see e.g. Hudson, 138 AD3d at 514-517). Beginning with the first stage of the inquiry, here, it is undisputed that plaintiff, who describes herself as a "woman of Indian descent," is a member of a protected class; that she was qualified for the position she held at Grey; that she suffered the adverse employment action of being terminated from her position; and that she alleges that she was denied a promotion, subjected to a hostile work environment, was sexually harassed and received disparate treatment from that accorded to Caucasian male employees, under circumstances that give rise to an inference of gender or racial/ethnic discrimination on defendants' part. Thus, I would find that plaintiff has met her burden of establishing a prima facie case for all of her claims of employment discrimination. I now turn to the next stage of the analysis, which is to ascertain whether defendants have provided any nondiscriminatory explanation for their actions as to each of plaintiff's claims, and if so, whether plaintiff has sufficiently responded with some evidence to counter defendants' explanation.
A. Wrongful Termination Claims (Claims Nine and Ten)
1. City HRL
With respect to whether defendants have proffered any nondiscriminatory explanation for plaintiff's termination, Walsh testified that, without consulting Cirullo, he determined that plaintiff should be among the employees terminated in the reduction in force because she was working only on a single project at that time and because Grey needed to cut costs. "There is no question that a reduction in force undertaken for economic reasons is a nondiscriminatory basis for employment terminations" (Hudson, 138 AD3d at 515). In addition, unsatisfactory work performance is also a nondiscriminatory basis for termination (id., citing Bennett at 45-46). Thus, defendants have met their burden of providing nondiscriminatory explanations for plaintiff's termination.
Having determined that defendants have satisfied their burden under the second stage of both evidentiary frameworks, I now turn to the last stage of the inquiry, which is to determine whether, under the McDonnell Douglas framework, plaintiff has proven that the reasons proffered by defendants for her termination were merely a pretext for discrimination against her, or whether, under the lesser burden of the "mixed motive" framework, plaintiff has raised an issue as to whether her termination was motivated, at least in part, by discrimination. As our Court has stated, in the face of nondiscriminatory explanations for defendants' actions, "plaintiff may not stand silent" (Bennett, 92 AD3d at 39).
Here, in support of her argument that Walsh's explanations for her termination were a pretext for defendants' discriminatory motivation, plaintiff asserts that she was replaced by two Caucasian men hired by Walsh after her departure. However, Cirullo has testified that plaintiff was not replaced and that no one took over her assignments. Indeed, on the day that plaintiff was terminated, she was working only on one aspect of a single project. Moreover, the defense offered testimony that one of the men to whom plaintiff refers had been transferred from another WPP subsidiary to perform work comparable to Cirullo's, not plaintiff's, including oversight of Business Systems, a responsibility plaintiff did not have while working at Grey. The other man to whom plaintiff refers had worked on DDS at another WPP subsidiary and was hired by Walsh [*15]in May 2010 to "fix" the DDS system. That man eventually replaced Cirullo, not plaintiff, as DDS Project Manager. Plaintiff has not addressed any of this evidence.
Furthermore, plaintiff has not controverted Walsh's testimony that he did not consult Cirullo in making the decision to terminate plaintiff. There is no evidence that Cirullo's actions in pulling plaintiff off projects or any of the mistreatment plaintiff allegedly suffered at the hands of Cirullo was designed to create a pretext for plaintiff's termination. Collaboration between Cirullo and Walsh for the purpose of creating a pretext for plaintiff's termination is not supported by the record, not only in light of Walsh's uncontroverted testimony that he did not consult Cirullo prior to deciding to terminate plaintiff, but also in view of Cirullo's uncontroverted testimony that, upon learning that Walsh had placed plaintiff on the list of employees to be terminated, he prevailed upon Walsh to keep plaintiff on the job to allow her more time to attempt to finish her assigned tasks. Moreover, Walsh terminated Cirullo just a matter of months after he terminated plaintiff. No evidence has been presented casting doubt on Walsh's testimony that, at the time he was implementing the reduction in force, as far as he knew, plaintiff was working only on a single project rather than at full capacity. In any event, plaintiff has presented no evidence suggesting that even a single reason given by defendants for her termination is pretextual, i.e., "false, misleading or incomplete" (Cadet-Legros, 135 AD3d at 200 [internal quotation marks omitted]).
Additionally, plaintiff does not dispute that 12 other people, all men, were terminated from Grey's IT department following consolidation.
Although Grey could be found vicariously liable for any discriminatory actions taken by Walsh and Cirullo with respect to her termination, as both of them exercised managerial or supervisory authority over plaintiff at all relevant times (see Zakrzewska, 14 NY3d at 479-480; McRedmond, 95 AD3d at 673), plaintiff has failed to rebut the nondiscriminatory reasons given for Walsh's actions and Walsh's assertion that Cirullo was not involved in plaintiff's termination. Accordingly, I concur with the majority that this claim, brought against Grey on a vicarious liability theory, does not survive defendants' summary judgment motion.
2. State HRL
Because plaintiff's City HRL claim, notwithstanding the more liberal analysis afforded to claims advanced under that law, does not survive defendants' summary judgment motion, a fortiori, its State HRL counterpart also fails on summary judgment review. Accordingly, I concur with the majority that this claim was properly dismissed.
B. Failure to Promote Claims (Claims One and Two)
1. City HRL
With regard to whether defendants have proffered any nondiscriminatory explanation for the failure to promote plaintiff, Grudzina has stated that he hired Cirullo because he was very knowledgeable about the DDS system, came highly recommended and was directly involved in the negotiation of that system. Plaintiff has made no showing that any of these nondiscriminatory reasons for hiring Cirullo was pretextual. Moreover, plaintiff has admitted that she has made no factual allegations of discrimination against Grudzina.
Plaintiff claims that Grey's discriminatory motive in failing to promote her is demonstrated by Cirullo's alleged statements to her about his experience and his own later dismissal by Walsh for poor managerial performance, both of which, she claims, show that he was not as qualified for the position as she was, and by his referral by a Caucasian man at WPP to Grudzina, another Caucasian man. She contends that all of these considerations give rise to an inference of gender, racial and/or ethnic discrimination. Her statement that Cirullo told her that he was not qualified for the position constitutes hearsay, and, in any case, does not establish discrimination on Grey's part, especially since Cirullo was already working in the DDS system at the time. Moreover, in April 2008, one month after plaintiff was passed over for promotion to the DDS manager position, plaintiff herself was promoted to the position of Vice President. Plaintiff's argument that Cirullo's referral by a Caucasian male to another Caucasian male demonstrates a discriminatory motive is speculative and conclusory. Thus, in response to [*16]defendants' motion, plaintiff has failed to raise a triable issue of fact as to whether Grey's denying plaintiff a promotion was attributable, in whole or in part, to gender, race and/or ethnic discrimination.
Moreover, plaintiff's argument that the failure to promote her is indicative of discrimination against her on Grey's part is undermined by the fact that in April 2008, one month after she was passed over for the DDS project manager position, upon her promotion to Vice President, her annual salary was increased to $105,000, followed by an increase to $115,000 in July 2008.
Therefore, plaintiff's claim of failure to promote in violation of the City HRL fails under both the McDonnell Douglas and "mixed motive" evidentiary frameworks. Accordingly, I believe that the motion court correctly granted summary dismissal of that claim.
2. State HRL
Because plaintiff's City HRL claim fails to survive the summary judgment motion under a McDonnell Douglas framework analysis, a fortiori, its State HRL counterpart also fails to survive the motion under the same evidentiary framework. Therefore, I concur with the majority that this claim, too, was correctly dismissed.
C. Hostile Work Environment Claim (Claim Three)
Plaintiff alleges that defendants created a sexually, racially and/or ethnically hostile work environment in violation of the City HRL. Specifically, plaintiff asserts that the series of incidents of alleged mistreatment she received from Cirullo and other Grey employees for the 18-month period following the alleged touching incident, i.e., from November 2008 to April 2010, during which Cirullo "made [her] life at Grey miserable," subjected her to a hostile work environment because of her gender, race and/or ethnicity.
1. Sexually hostile work environment
On a claim of creation of a sexually hostile work environment in violation of the City HRL, a plaintiff must establish that she was "treated less well than other employees because of her gender" (see Williams, 61 AD3d at 78; see also Short v Deutsche Bank Sec., Inc., 79 AD3d at 505-506).
We addressed the subject of sexually hostile work environment in Hernandez v Kaisman (103 AD3d 106 [1st Dept 2012]). In Hernandez, the defendant, a physician, sent a series of sexually offensive email messages and repeatedly made sexually offensive comments to his employees. In modifying the motion court's order granting summary dismissal of the plaintiffs' claims to the extent of reinstating their claim of sexual discrimination/sexually hostile work environment under the City HRL, we found that the defendant's comments and email messages objectifying women's bodies, including comments about the size of one of his employee's breasts and the size of another employee's buttocks, and exposing them to sexual ridicule clearly showed that the defendant was creating a sexually hostile work environment (id. at 115). Thus, in Hernandez, the facts presented demonstrated that that case was not the "truly insubstantial case" in which a defendant's behavior amounts to no more than "petty slights and trivial inconveniences" (id. at 115). Significantly for present purposes, the facts also clearly showed that the defendant's conduct was sexually and gender motivated and, as such, supported the plaintiffs' sexually hostile work environment claim. Therefore, in Hernandez, denial of the defendant's summary judgment motion was required.
This case presents no such situation, however. To be sure, the recurring mistreatment plaintiff allegedly received from Cirullo and other employees at Grey over the 18-month period in question was disrespectful and demeaning, far exceeding the "petty slights and trivial inconveniences" found in truly insubstantial cases. There is no evidence, however, that in any of the series of incidents of harsh mistreatment of plaintiff that allegedly occurred during that time, "she was treated less well than other employees because of her [gender]" (see Chin v New York City Hous. Auth., 106 AD3d 443, 445 [1st Dept 2013], lv denied 22 NY3d 861 [2014] [emphasis added]; Short, 79 AD3d at 505-506; Williams, 61 AD3d at 78), or that defendants' conduct was, even in part, sexually motivated (see Chin at 445). In contrast to Hernandez, where each of the email messages and comments in question had a sexually offensive component to it that signaled the defendant's intention to foster a sexually demeaning work environment for women, the [*17]record in this case is bereft of any evidence that any of the degrading incidents described by plaintiff signaled a sexual or gender-based motivation on the part of Cirullo or any other Grey employee.
However badly plaintiff was treated, in order for plaintiff's claim of sexually hostile work environment in violation of the City HRL, which is not a "general civility code" (Williams, 61 AD3d at 79 [internal quotation marks omitted]), to survive a summary judgment motion, plaintiff must proffer "some evidence" that defendants' adverse conduct was motivated by gender or sexual discrimination (see Cadet-Legros at 200; Bennett at 45). Here, plaintiff proffers no such evidence.
Furthermore, Cirullo provided nondiscriminatory explanations for his actions, none of which are rebutted by plaintiff. With respect to plaintiff's allegations that Cirullo put her on and took her off projects, Cirullo explained that he also did this with other employees, male and female, when they had completed one aspect of a given project and when he thought that they would make a valuable contribution to a given aspect of another project. He further explained that he would reassign plaintiff because at times plaintiff's knowledge was redundant of that of other employees who were also working on the same project and that he thought that her time would be better spent on other projects. He also stated that he did not provide her with additional resources to aid her in training clients to use the computerized document system because only plaintiff and one other employee working with her were trained in the use of that system and were the only ones who could train others to use it. With regard to plaintiff's complaint that she had to arrange meetings, she has acknowledged that other people, including Cirullo, also set up meetings and invited her to attend them.
Thus, plaintiff has proffered no evidence rebutting Cirullo's nondiscriminatory explanations for the conduct of which she complains.
Notably, the uncontroverted record reveals that none of plaintiff's complaints to Grudzina or the human resources department manager mentioned gender-based or sexually discriminatory conduct, including her March 2009 complaint to Grudzina about Cirullo which apparently concerned Cirullo's failure to invite her to meetings; her May 2009 complaint to the human resources department manager about Cirullo's giving her the task of sending out electronic meeting notices, not giving her the resources she needed to do her job and not giving her any indication of what was expected of her; and her subsequent complaint to both Grudzina and the manager about Cirullo's taking her off a project three days after she made her prior May 2009 complaint to the manager.
Moreover, Cirullo has stated that after plaintiff met with the manager of Grey's human resources department and complained about, among other things, not knowing what was expected of her, Cirullo met with that same manager, who advised him to prepare a job description for plaintiff. He did so and reviewed it with plaintiff, giving her an outline of her responsibilities. According to Cirullo, plaintiff voiced no objections or questions with regard to her designated responsibilities and did not tell Cirullo that she needed any further resources to complete her designated tasks. Plaintiff does not dispute Cirullo's statement.
Furthermore, throughout the 18-month period in question, plaintiff's position as Vice President and her annual salary of $115,000 remained unchanged, and there is no evidence that Cirullo or anyone else at Grey took any steps to remove her from that position or to decrease her salary. Indeed, it is uncontroverted that when Walsh determined that plaintiff should be terminated in February 2010, Cirullo intervened and successfully persuaded him to postpone her termination to April 2010. Cirullo's intervention to forestall plaintiff's termination is inconsistent with plaintiff's claim that Cirullo actions were motivated by discrimination against her.
Thus, there is insufficient evidence to show that gender discrimination played any part in Cirullo's decisions or actions over the course of the 18-month period in question.
2. Racially and/or ethnically hostile work environment
With respect to that aspect of plaintiff's claim alleging that defendants created a racially and/or ethnically hostile work environment, the sole evidentiary basis of that claim is plaintiff's [*18]statement that Cirullo once referred to her as "dark." That comment could just as reasonably be interpreted as Cirullo's commiserating with plaintiff, however, by commenting on improper racial profiling by the police to explain to plaintiff why she was pulled off the subway, and not reflective of any racial or ethnic bias on his part.
Moreover, plaintiff proffers no evidence of any nexus between Cirullo's remark about her and the course of mistreatment she allegedly endured. At most, Cirullo's comment was a stray remark which does not constitute evidence of discrimination (see Godbolt v Verizon, N.Y. Inc., 115 AD3d 493, 494 [1st Dept 2014], lv denied 24 NY3d 901 [2014]; Melman v Montefiore Med. Ctr., 98 AD3d at 125).
Furthermore, Grey cannot be held liable for any discriminatory actions taken against plaintiff during the 18- month period in question by any Grey employees other than Cirullo because, with the exception of Walsh, who played no role in the course of mistreatment plaintiff allegedly endured, no other Grey employee, including Doug Livingston, had any managerial or supervisory authority over plaintiff (see Zakrzewska, 14 NY3d at 479-480; McRedmond, 95 AD3d at 673).
Therefore, in my view, the motion court properly dismissed plaintiff's claim of creation of a sexually, racially and/or ethnically hostile work environment in violation of the City HRL.
D. Sexual Harassment Claim (Claim Three)
To the extent that plaintiff alleges a sexual harassment claim in connection with her hostile work environment claim, the only unwelcome sexual conduct she alleges are the three alleged incidents from the fall of 2008: Cirullo's complimenting her hair on his first day of work as Senior Vice President; his complimenting her on her boots the following day; and his touching of her thigh shortly thereafter, apparently during the November 2008 meeting. As noted, Cirullo has denied the touching incident.
Here, although plaintiff "may not stand silent" (Bennett, 92 AD3d at 39), she proffers no evidence that the alleged incidents in question, the two compliments and the one touching incident, amount to anything more than "petty slights" (see Williams, at 80). Moreover, plaintiff does not support her contention that these incidents amount to an overture by Cirullo that plaintiff have a sexual relationship with him with "some evidence" sufficient to raise a triable issue of fact (see Cadet-Legros at 200; Bennett at 45). Finally, there is no evidence that any unwelcome sexual conduct was visited upon plaintiff from November 2008 to her departure in April 2010.
Although both plaintiff and the majority urge that we not consider the three incidents in question in isolation, but in connection with the incidents of mistreatment that occurred in the 18-month period that followed, to do so in the context of plaintiff's third claim for relief would improperly conflate her sexual harassment and hostile work environment claims. Further, in advancing this argument, plaintiff is attempting to resurrect her retaliation claims (claims four, seven, eight, eleven and twelve), which, as previously noted, were dismissed by the motion court without opposition from plaintiff, and have not been raised on the present appeal (see discussion in § III.F, infra).
Therefore, to the extent that, in claim three, plaintiff alleges a City HRL sexual harassment claim, I believe that the motion court properly dismissed it.
E. Disparate Treatment Claims (Claims Five and Six)
I now turn to plaintiff's claims of disparate treatment motivated by gender and racial and/or ethnic discrimination on defendants' part.
1. City HRL (Claim Six)
At the outset, plaintiff proffers no evidence that Caucasian men or any other Grey employees whose race or ethnicity differed from her own and who were similarly situated to her were better treated by defendants than she was.
To the extent that the factual underpinnings of plaintiff's claim of disparate treatment in violation of the City HRL have not already been addressed in our preceding discussion of plaintiff's wrongful termination and hostile work environment claims, applying the Bennett burden-shifting analysis, which remains applicable to plaintiff's claims of City HRL discrimination other than wrongful termination and has continuing vitality in our Court's [*19]jurisprudence (see Arifi v Central Moving & Stor. Co., Inc., 147 AD3d 551, 551 [1st Dept 2017] [applying Bennett analysis to City HRL hostile work environment claim]; Ji Sun Jennifer Kim v Goldberg, Weprin, Finkel, Goldstein, LLP, 120 AD3d 18, 25-26 [1st Dept 2014] [City HRL retaliatory discharge and gender/pregnancy discrimination claims]; Chin v New York City Hous. Auth., 106 AD3d at 444-445 [City HRL retaliation and hostile work environment claims], where, as here, no evidence is presented to rebut any of defendants' proffered nondiscriminatory reasons for their actions, plaintiff's discrimination claims must fail (see Arifi, 147 AD3d at 551 [the plaintiff's failure to present any evidence of discriminatory animus in response to the defendant corporation's proffered nondiscriminatory reason for its actions was "fatal" to the plaintiff's hostile work environment claim, citing Cadet-Legros at 202; Bennett at 39-40]; see also Chin, 106 AD3d at 444-445 [upholding dismissal of City HRL retaliation claim where the plaintiff employee failed to raise an issue of fact as to whether nondiscriminatory reasons proffered by the defendant authority for failing to promote her were pretextual]). Neither does plaintiff proffer any evidence that any negative treatment she allegedly experienced in the course of her employment at Grey due to Cirullo's or Walsh's actions was "because of her gender" (see Short, 79 AD3d at 505-506; Williams, 61 AD3d at 78) or was motivated by race and/or ethnicity discrimination.
Moreover, plaintiff's claim of disparate treatment is undermined by the fact that she received promotions and salary increases while at Grey, rising from the position of business analyst in its Financial Services Department at an annual salary of $70,000 to the position of Vice President at an annual salary of $115,000.
Therefore, in my view, this claim is not actionable under either the McDonnell Douglas or the "mixed motive" evidentiary framework and was properly dismissed by the motion court.
2. State HRL (Claim Five)
Because plaintiff's City HRL claim fails to survive under the McDonnell Douglas framework analysis, a fortiori, its State HRL counterpart also fails to survive defendant's summary judgment motion under the same evidentiary framework.
Therefore, I concur with the majority that this claim was properly dismissed.
F. Retaliation Claims (Claims Four, Seven, Eight, Eleven and Twelve)
None of plaintiff's retaliation claims (claims four, seven, eight, eleven and twelve) are properly raised on this appeal. Plaintiff failed to respond to defendants' motion as to those claims before the motion court and did not move for reargument upon that court's dismissal of them. Accordingly, any challenge to the dismissal of those claims is unpreserved on the record before us.
Plaintiff's mention in her appellate brief that defendants "discriminated against [her] by subjecting her to disparate treatment after she turned down Cirullo's advance" also fails to revive these claims here, as she neither mentions retaliation, nor makes any causal link between this general and vague claim and any specific actions of disparate treatment taken against her by defendants. Plaintiff never develops or discusses this argument further, either in her brief, nor by way of oral argument. In sum, plaintiff has failed to raise her retaliation claims on this appeal.
The majority opines that claims four is a properly presented City HRL claim for a discriminatory hostile work environment, and that claims seven and eight are properly presented as State and City HRL claims for discriminatory disparate treatment. In doing so, the majority conflates these claims, which allege sexually hostile work environment and disparate treatment, respectively, as a result of plaintiff's rejection of Cirullo's alleged advance, and which are clearly for retaliation, with the City HRL discriminatory hostile work environment claim, which is separately presented in claim three, and with the State and City HRL disparate treatment claims, which are separately presented in claims five and six, and I would so treat them. Accordingly, I believe that Supreme Court properly dismissed claims four, seven and eight in their entirety.
The majority's reliance upon Ji Sun Jennifer Kim v Goldberg, Weprin, Finkel, Goldstein LLP (120 AD3d 18 [1st Dept 2014]) in arguing that the temporal proximity of Cirullo's alleged sexual overture and his subsequent change in behavior toward her is sufficient to demonstrate a causal connection between these two alleged events is misplaced. In Kim, we upheld the [*20]plaintiff's claims of retaliatory discharge on summary judgment review, based in part upon our conclusion that the temporal proximity of the second of the plaintiff's two complaints of discriminatory treatment in the workplace and her termination two months later could be sufficient for a jury to find a causal connection between them (id. at 25). Here, plaintiff makes no claim of retaliation based on complaints of discrimination. And even under the majority's view, the three incidents she cites in support of her allegation that Cirullo's conduct amounted to a sexual overture were temporally removed from the noxious treatment she experienced and were unsupported by any evidentiary nexus with Cirullo's subsequent behavior towards her.
The view of the majority is that plaintiff's mere conclusory reassertion of being treated less well than other employees because of her gender in response to defendants' proffer of evidence of nondiscriminatory explanations for their actions is sufficient to defeat defendants' motion for summary judgment. As our jurisprudence following Bennett has consistently established, however, where a defendant meets its burden on the motion by showing that upon considering the evidence presented and "drawing all reasonable inferences in plaintiff's favor, no jury could find the defendant liable under any of the evidentiary routes
[applicable to discrimination cases], . . . a plaintiff may
defeat summary judgment by offering some evidence that at least one of the reasons proffered by defendant is false, misleading
or incomplete'" (Watson v Emblem Health Servs., 158 AD3d 179, 183 [1st Dept 2018], quoting Bennett, 92 AD3d at 45; see Cadet-Legros, 135 AD3d at 200).
By advancing its differing view in this case, the majority is, in effect, virtually eliminating this established standard for review of summary judgment motions in City HRL cases, rendering it indistinguishable from that on review of CPLR 3211(a)(7) motions to dismiss in such cases. Furthermore, the majority is eliminating the relaxed requirement of Bennett and its progeny that a minimal evidentiary showing must be made by the plaintiff to refute the defendant's nondiscriminatory explanations.
Adhering to our precedent, I would apply the Bennett standard and find that here, plaintiff failed to proffer any evidence of discriminatory conduct or motive in response to defendants' nondiscriminatory explanations for their treatment of her. The record as presented fails to raise a material issue of fact as to whether defendants' treatment of her was the product of unlawful discrimination (cf. Watson, 158 AD3d at 183-185 [evidence of employer's failure to reasonably accommodate employee's disability, refusal to acknowledge medical documentation of her condition, and numerous emails containing derogatory comments about her medical condition sufficed to raise triable fact question of possible pretextual motive]).
Accordingly, I would affirm the motion court in all respects.
Order of the Supreme Court, New York County (Donna M. Mills, J.), entered May 19, 2016, modified, on the law, and otherwise affirmed, without costs.
Opinion by Moulton, J. All concur except Friedman, J.P. and Kahn, J. who dissent in part in an Opinion by Kahn, J.
Friedman, J.P., Kahn, Kern, Oing, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: AUGUST 2, 2018
CLERK



Footnotes

Footnote 1:Suri's effort to carve the small Business Systems unit, of
which she was a part, out of the overall reduction in force, in order to show that she was the only woman impacted by the reduction in force within the smaller group, also fails. The sample sizes are too small to support a statistical inference of discrimination (see Hudson v Merrill Lynch & Co., Inc., 138 AD3d 511, 517 [1st Dept 2016], lv denied 28 NY3d 902 [2016]; Armstrong v Sensormatic/ADT, 100 AD3d 492 [1st Dept 2012]).
Footnote 2:Prior to Williams, our cases held that the New York State and City Human Rights Laws applied the same federal standards for quid pro quo and hostile environment sexual harassment claims, differing only in that the City Human Rights Law allows punitive damages (see Walsh v Covenant House, 244 AD2d 214, 215 [1st Dept 1997]). Quid pro quo harassment occurs when unwelcome sexual conduct (whether sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature) is used explicitly or implicitly, as the basis for employment decisions affecting compensation, terms, conditions, or privileges of employment (see Matter of Father Belle Community Ctr. v New York State Div. of Human Rights, 221 AD2d 44, 50 [4th Dept 1996], lv denied 89 NY2d 809 [1997]). The focus is on whether the supervisor has expressly or tacitly linked tangible job benefits to the acceptance or rejection of sexual advances and a claim is stated whether the employee rejects the advance and suffers the consequences or submits to the advance (id.).

Footnote 3:However, questions of severity and pervasiveness apply to the scope of damages (Williams at 76).

Footnote 4:Prior to 1998 federal cases separately analyzed, under federal law, quid quo pro and hostile work environment claims; hostile work environment claims spoke to an environment permeated with sexually harassing comments, materials or conduct (see Sharon P. Stiller, Employment Law in New York § 3:23 at 206 [2d ed 2012]). However, federal law moved away from those distinctions to focus on whether there was a tangible job detriment that altered the terms of employment (see Faragher v City of Boca Raton, 524 US 775 [1998]; Burlington Indus. Inc. v Ellerth, 524 US 742 [1998]).
Footnote 5:Suri's claim that Cirullo created a hostile work environment after she rebuffed his alleged sexual overture is before us on this appeal. We disagree with the dissent to the extent that the dissent characterizes this claim as one for retaliation under Administrative Code § 8-107(7), and then, as a result of this characterization, concludes that the claim sounding in hostile work environment is not before us. The dissent rejects our position that the three incidents in question must be viewed holistically in connection with the 18-month period of mistreatment that ensued. To view these incidents holistically, the dissent contends, would improperly resurrect Suri's retaliation claims (denominated in Suri's complaint as Claim Four, Claims Seven and Eight, and Claims Eleven and Twelve). However, Claim Four and Claims Seven and Eight of the complaint speak not only to retaliation, but to a hostile work environment which ensued as the result of Suri's rejection of Cirullo's alleged advance. Claim Four provides that "[f]rom October, 2008 through April, 2010, Cirullo subjected plaintiff to a hostile work environment in retaliation for her rejection of his November, 2008 sexual advance, in violation of Chapter Eight of the New York City Administrative Code" and concludes that "Grey is liable to plaintiff for the hostile work environment created by Cirullo." Claims Seven and Eight provide that "[f]rom October, 2008 through April, 2010, defendants subjected plaintiff to disparate terms and conditions of employment in retaliation for her rejection of Cirullo's November, 2008 sexual advance, in violation of . . . Chapter Eight of the New York City Administrative Code." Thus, Suri's claim is properly before us as a claim alleging gender-based discrimination in violation of Administrative Code § 8-107(1)(a). 

Footnote 6:The dissent applies the Bennett framework and concludes that Suri's hostile work environment claim fails because Suri did not rebut Cirullo's nondiscriminatory explanations for the way she was treated during the 18-month period. The dissent also cites the Bennett framework in concluding that Suri did not support with "some evidence" her claim that Cirullo made a sexual overture sufficient to raise an issue of fact.

Footnote 7:The McDonnell Douglas framework was created to apply to an "adverse employment action" as defined by federal law. As noted above the City Human Rights Law is broader, and differential treatment may be actionable even where that treatment does not result in an employee's discharge or an "adverse employment action" as defined by federal law.
Footnote 8:The mixed-motive test employs the same burden-shifting as the McDonnell Douglas test (see Hudson, 138 AD3d at 511). It recognizes that it is not uncommon for there to be multiple or mixed motives for discrimination; the City Human Rights Law proscribes such partial discrimination and requires only that a plaintiff prove that discrimination was a motivating factor for an adverse employment action (see Bennett, 92 AD3d at 40).

Footnote 9: The defendants were entitled to summary judgment in light of the employer's credible evidence of reports of the plaintiff's unsatisfactory work performance, undisputed evidence that the plaintiff frequently slept and drank on the job, and left early without explanation (Bennett at 46). The plaintiff's claim of age discrimination was undermined by the fact that he was replaced by an older worker, and his claim of race discrimination was unsupported by evidence that a similarly situated, poor performing, black coworker was treated more leniently (id.).

Footnote 10:The Second Circuit and some sister circuits have similarly not applied the McDonnell Douglas burden-shifting framework to hostile work environment claims under federal law (see Reynolds v Barrett, 685 F3d 193, 202 [2d Cir 2012]; Moody v Atlantic City Bd. of Educ., 870 F3d 206, 213 n 11 [3d Cir 2017] ["Some of our sister circuits have concluded that the McDonnell Douglas framework does not apply in hostile work environment sexual harassment cases . . . We agree that the burden-shifting framework is inapplicable here because . . . there can be no legitimate justification for a hostile work environment"]).

Footnote 1: The record is somewhat unclear as to the timing of these three incidents. The personnel records and plaintiff's deposition testimony indicate that Cirullo's two comments allegedly occurred in early September 2008, immediately upon his promotion, while the meeting incident took place two months later. Plaintiff also testified and stated in her sworn affidavit that the two comments occurred in October 2008, about a week before the November 2008 meeting. In any case, it is undisputed that none of the three incidents occurred after November 2008.