OPINION OF THE COURT
Mazzarelli, J.P.
Plaintiffs, all women, worked for defendant and another doctor, in their medical office. Plaintiff Hernandez was employed in defendant’s office from January 2006 through December 2006, as a medical clerk, and then as an assistant office manager. Plaintiff Herarte was employed by defendant as a medical clerk for over three years. Plaintiff Stern began working in the office as a physician’s assistant in June 2003.
Plaintiffs allege that, in violation of the New York State Human Rights Law (State HRL) (Executive Law § 296) and the New York City Human Rights Law (City HRL) (Administrative Code of City of NY § 8-107), defendant created a sexually hostile work environment in the office. Most of the incidents of which they complain occurred in the latter half of 2006, at which time plaintiffs left defendant’s employ. The focus of plaintiffs’ complaint is on a series of emails sent by defendant in October and November 2006 containing what plaintiffs describe as offensive and obscene material.
The first of these emails was sent to all three plaintiffs as well as other male and female employees. The body of the email read, “This is hysterical. Do not listen if u are potentially offended,” and attached an audio clip of a lecture given by a “professor” on the many uses of the word “Fuck,” including its sexual connotation.
The second email was sent to all three plaintiffs as well as other male and female employees, and was titled “How to choose your holiday turkey.” It attached a video of volunteers on a hidden camera style show who had been blindfolded and asked to feel what they thought were Butterball turkeys. The camera ultimately revealed that the subjects were actually feeling the naked buttocks of a man.
The third email contained a moving image of a snow sculpture in the shape of a penis “ejaculating” snow balls. The body of the email read “You know how every winter we have everybody send the snowball email thing out to everybody. Well this is pay *109 backs for all that crap they have sent out to me. PS Don’t send it back to me!!!!” The email also instructed that “you have been hit with a snow ball” and urged the viewer to send the email on to others.
The fourth email was sent to plaintiffs Hernandez and Herarte, as well as other male and female employees, and was titled “Birthday Vibrator.” The email attached a scene from the R-rated 2001 movie “Not Another Teen Movie,” in which a girl attempts to masturbate with a large vibrator under her bed covers on her birthday and her family enters her room with a birthday cake. The scene ends with the vibrator landing in the cake and splattering cake on everyone.
The fifth email was sent to plaintiff Hernandez as well as other male and female employees and was titled “The Perfect Woman.” It attached an image of a headless female body with two pairs of legs.
In addition to the emails, plaintiffs further alleged that defendant told Hernandez that she should get breast implants and offered to take her to a doctor who could perform the procedure; that defendant pointed out to Hernandez on one occasion that her underwear was exposed but told her that she should not have adjusted her pants because he had been “enjoying” himself; that defendant placed whipped cream on the side of his mouth and asked Hernandez if “this looked familiar”; that defendant referred to himself as “pimp Kaisman”; that defendant repeatedly told Herarte that she needed to lose weight; that defendant once touched Herarte’s rear end and told her she needed to “tighten it up”; that defendant attempted to get Herarte to socialize with his male friends despite her refusal; that Stern found condoms placed by defendant in a drawer that was accessible to all employees; that all the plaintiffs were aware that defendant took females, including other female employees, into rooms for extended periods of time; that defendant often spoke in public about his affinity for women with large breasts; that defendant frequently walked around the office in only long johns and a tee shirt; and that defendant showed Hernandez and Herarte a pen holder which was a model of a person and in which the pen would be inserted into its “rectum.”
Defendant moved for summary judgment dismissing plaintiffs’ claims under the State HRL and the City HRL. He argued that plaintiffs’ claims for hostile work environment under the State HRL should be dismissed because the evidence failed to satisfy the “severe and pervasive” standard required for a claim, and *110 because no reasonable jury could find that plaintiffs perceived the environment to be hostile or abusive on account of their gender. He also asserted that the evidence showed that none of plaintiffs’ employment was altered as a result of any alleged harassment and that plaintiffs could not demonstrate that they were treated differently from male employees or that the alleged conduct occurred because of their sex. Acknowledging the relaxed standard under the City HRL, defendant asserted that the evidence was nevertheless inadequate to prove a violation of the statute.
In opposition, plaintiffs argued that defendant committed numerous perverted actions between September 2006 and December 2006 which were directed at women and derogatory in nature, thereby creating a hostile work environment. They further claimed that defendant’s acts were clearly gender based and were subjectively intolerable to plaintiffs. They added that the totality of the circumstances demonstrated that the conduct alleged was so pervasive as to create an objectively hostile work environment. Plaintiffs separately contended that the court was required to resolve all issues of fact in their favor and that defendant’s actions interfered with their ability to perform their jobs and forced them to leave the office.
The court granted defendant’s motion, finding that the evidence did not support plaintiffs’ hostile environment claim under the State HRL since much of the complained-of conduct was directed at both the men and the women in the office and could be perceived as offensive to people of either sex (2011 NY Slip Op 31182[U] [2011]). It further found that the conduct directed specifically at the plaintiffs due to their gender was too sporadic to rise to an actionable level.
The motion court observed that plaintiffs did not miss work due to defendant’s behavior and that their salaries were not impacted. The court concluded that, even considering the totality of the circumstances in a light most favorable to plaintiffs, a reasonable person could not find that plaintiffs were subjected to a hostile work environment because they had only been exposed to “mere offensive utterance[s]” on several occasions, as opposed to pervasive, ongoing harassment (id. at *12). In that regard, the court remarked that while Herarte and Stern worked for defendant for over three years, the emails were sent over a one-month time period and defendant’s other behavior was sporadic.
As for the comments defendant made to Hernandez about her breasts and her buttocks, the court found that they were not so *111 extraordinarily severe as to sustain a claim. The court also found that much of what plaintiffs stated about defendant’s alleged sexual behavior with other employees and visitors was seconder third-hand and did not amount to a change in the terms of plaintiffs’ employment.
While acknowledging the broader reach of the City HRL, the court held that plaintiffs nevertheless failed to rebut defendant’s prima facie showing that they were treated no worse than the male employees in the office. Indeed, the court noted, much of defendant’s behavior could be considered equally offensive and inappropriate to male and female employees. The court separately found that the clear gender-based conduct could be reasonably found to be no more than “petty slights and trivial inconveniences” (id. at *20).
The United States Supreme Court, in cases brought under title VII of the Civil Rights Act of 1964, has held that a hostile work environment exists “[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment” (Harris v Forklift Systems, Inc., 510 US 17, 21 [1993] [citations and internal quotation marks omitted]).
“[W]hether an environment is ‘hostile’ or ‘abusive’ can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance. The effect on the employee’s psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required” (id. at 23).
In addition, “the conduct must both have altered the conditions of the victim’s employment by being subjectively perceived as abusive by the plaintiff, and have created an objectively hostile or abusive environment—one that a reasonable person would find to be so” (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 311 [2004], citing Harris at 21).
Of course, there can be no claim for sexual discrimination, including that based on a hostile work environment, unless the *112 plaintiff was treated differently because of her sex (see Oncale v Sundowner Offshore Services, Inc., 523 US 75, 80 [1998]).
“The mere fact that men and women are both exposed to the same offensive circumstances on the job site, however, does not mean that, as a matter of law, their work conditions are necessarily equally harsh. The objective hostility of a work environment depends on the totality of the circumstances. Further, the perspective from which the evidence must be assessed is that of a reasonable person in the plaintiffs position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target” (Petrosino v Bell Atl., 385 F3d 210, 221 [2d Cir 2004] [internal quotation marks and citations omitted]).
Here, defendant argues that plaintiffs were not treated differently based on their sex because both women and men were exposed to the emails distributed by him. This, however, ignores the “social context” in which the emails were distributed. That context involved several incidents in which defendant clearly objectified women. These included touching Herarte’s backside and suggesting she “tighten” it up, telling Hernandez she should get a breast enlargement and that he “enjoyed” looking at her exposed underwear, and generally commenting that he liked large-breasted women. Considering the totality of the circumstances, a jury could reasonably determine that the emails were sent in an effort to specifically provoke a reaction from the women in the office, and that they were therefore singled out from the male employees.
This does not mean that plaintiffs have submitted sufficient evidence to establish an issue of fact whether they were subjected to a hostile workplace environment. We accept as true plaintiffs’ deposition testimony that, subjectively, they viewed defendant’s behavior as offensive and that it made coming to work extremely stressful and upsetting. We must determine, however, whether a reasonable person would have objectively considered the environment to have been sexually hostile.
Until recently, New York State courts routinely analyzed this element of the hostile workplace environment claims in the same manner, whether brought under the State HRL or the City HRL (see Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305 n 3 [2004]). Courts subjected both types of claims to the *113 “severe and pervasive” standard. Under this standard, courts were required to dismiss hostile work environment claims brought under the State and City Human Rights Laws where the environment was not objectively hostile because the behavior complained of amounted to no more than “mild” or “isolated” incidents that could not be said to permeate the workplace (id. at 311 [finding that racial epithets did not “pervade” the workplace, having allegedly occurred on three occasions over nine years]; Alfano v Costello, 294 F3d 365 [2d Cir 2002] [reversing verdict in favor of plaintiff based on five incidents when she was told she ate carrots and other food “seductively,” carrots were placed in her presence arranged to mimic male genitalia, and a vulgar cartoon was left in plaintiffs mailbox]; Brennan v Metropolitan Opera Assn., Inc., 192 F3d 310 [2d Cir 1999] [one episode of “lewd banter” over the course of three years]). At the same time, courts would uphold sexual discrimination claims brought under both statutes where women were subjected to sexual ridicule “day after day over the course of several years without supervisory intervention” (Petrosino, 385 F3d at 222; see Raniola v Bratton, 243 F3d 610, 621 [2d Cir 2001] [finding triable issue of fact where plaintiff was allegedly subjected to offensive sex-based remarks, workplace sabotage, disproportionately burdensome work assignments, and one serious public threat of physical harm over 30 months]).
The “severe and pervasive” standard was intended to forge “a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury” (Harris, 510 US at 21). However, in Williams v New York City Hous. Auth. (61 AD3d 62 [1st Dept 2009]), this Court concluded that the standard no longer applied to the New York City HRL. That was because the City HRL had been amended by the Local Civil Rights Restoration Act of 2005, which expressly mandated that the City HRL be “construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human'rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed” (Local Law No. 85 [2005] of City of NY § 7). Bearing this principle in mind, this Court held in Williams that, for purposes of hostile workplace environment claims brought under the City HRL, “questions of ‘severity’ and ‘pervasiveness’ are applicable to consideration of the *114 scope of permissible damages, but not to the question of underlying liability” (61 AD3d at 76). On the other hand, however, Williams recognized that the City HRL is not a “general civility code,” such that an employer can be held liable for “petty slights and trivial inconveniences” (id. at 79-80). At bottom, Williams held,
“[f]or [City] HRL liability . . . the primary issue for a trier of fact in harassment cases, as in other terms and conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender. At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred” {id. at 78).
Because of Williams, we are required to analyze plaintiffs’ State and City HRL claims separately. Subjecting the state claim to the “severe and pervasive” standard, plaintiffs fall short. There is no question that the emails that defendant circulated in the office were inappropriate. However, their distribution by defendant is closer to what would be described as “boorish” behavior than the “severe” types of incidents which have been found to create a hostile workplace environment (see e.g. Patane v Clark, 508 F3d 106 [2d Cir 2007] [plaintiff stated claim for hostile workplace discrimination by alleging she was regularly required to handle pornographic videotapes while opening supervisor’s mail and supervisor once viewed hard core pornographic websites on her workplace computer]). The only email that contained what could arguably be described as pornographic material was the video excerpt entitled “Birthday Vibrator” and it does not appear that the clip was explicit. The other offensive incidents, including defendant’s touching Herarte’s rear end and suggesting she “tighten” it up, telling Hernandez she should get a breast enlargement and that he “enjoyed” looking at her exposed underwear, and generally commenting that he liked large-breasted women, are too sporadic to be considered “pervasive.”
While we find that the complained-of incidents do not rise to the level of “severe and pervasive” for purposes of a claim pursuant to the State HRL, this does not dispose of the question whether plaintiffs’ City HRL claim is still viable. Indeed, we can only dismiss the latter claim if we determine that this is a “truly insubstantial case” in which defendant’s behavior can *115 not be said to fall within the “broad range of conduct that falls between ‘severe and pervasive’ on the one hand and a ‘petty slight or trivial inconvenience’ on the other” (Williams, 61 AD3d at 80). Considering the totality of the circumstances, this is not a “truly insubstantial case.” Viewed independently, defendant’s dissemination of emails containing mildly offensive sexual media content may not have been enough to rise to the level of a hostile environment under the City HRL. However, the overall context in which the emails were sent cannot be ignored. The record supports plaintiffs’ claim that defendant took a perverse pleasure in demeaning and embarrassing his female employees. This was obvious from his statements, related by plaintiffs, concerning, in the case of Hernandez, the size of her breasts, and in the case of Herarte, the size of her backside. While such statements may have been isolated, that is irrelevant under the City HRL, since “[o]ne can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and be actionable” (Williams, 61 AD3d at 80 n 30). Here, the comments and emails objectifying women’s bodies and exposing them to sexual ridicule, even if considered “isolated,” clearly signaled that defendant considered it appropriate to foster an office environment that degraded women.
As this Court recognized in Williams,
“the text and legislative history [of the Restoration Act] represent a desire that the City HRL ‘meld the broadest vision of social justice with the strongest law enforcement deterrent.’ Whether or not that desire is wise as a matter of legislative policy, our judicial function is to give force to legislative decisions” (id. at 68-69). *121 ting the late filing of proof of service, absent an order curing the irregularity, the default judgment was a ‘nullity requiring vacatur’ (71 AD3d at 1414, quoting Rosato v Ricciardi, 174 AD2d 937, 938 [1991]).
*115 Because, at the very least, defendant’s conduct can be characterized as having subjected plaintiffs to “differential treatment,” the broad remedial purposes of the City HRL would be countermanded by dismissal of the claim.
Accordingly, the order of the Supreme Court, New York County (Debra A. James, J.), entered April 19, 2011, which granted defendant’s motion for summary judgment dismissing the cause of action alleging violations of the New York State and City Human Rights Laws, should be modified, on the law, to reinstate plaintiffs’ claim for sexual discrimination brought under the city law, and otherwise affirmed, without costs.
*116 Tom, J.P., Saxe, Catterson and DeGrasse, JJ., concur.
Order, Supreme Court, New York County, entered April 19, 2011, modified, on the law, to reinstate plaintiffs’ claim for sexual discrimination brought under the New York City Human Rights Law, and otherwise affirmed, without costs.