Golston-Green v City of New York (2020 NY Slip Op 02768)





Golston-Green v City of New York


2020 NY Slip Op 02768


Decided on May 13, 2020


Appellate Division, Second Department


Brathwaite Nelson, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on May 13, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
MARK C. DILLON
HECTOR D. LASALLE
VALERIE BRATHWAITE NELSON, JJ.


2016-02462 
 (Index No. 28117/09)

[*1]Tamara Golston-Green, appellant, 
v
City of New York, et al., respondents.



APPEAL by the plaintiff, in an action to recover damages for employment discrimination on the basis of gender and race in violation of Executive Law § 296 and Administrative Code of the City of New York § 8-107, from an order of the Supreme Court (Phyllis Orlikoff Flug, J.), entered January 4, 2016, in Queens County. The order, insofar as appealed from, granted the defendants' motion for summary judgment dismissing the complaint.



Ofodile & Associates, P.C., Brooklyn, NY (Anthony C. Ofodile of counsel), for appellant.
James E. Johnson, Corporation Counsel, New York, NY (Pamela Seider Dolgow and Susan Paulson of counsel), for respondent.



BRATHWAITE NELSON, J.


OPINION & ORDER
This appeal presents the opportunity to consider whether a plaintiff alleging disparate treatment in the workplace must demonstrate that she or he was subject to a "materially" adverse employment action in order to establish liability under the New York City Human Rights Law (Administrative Code of City of NY § 8-107[7]). We hold that under the New York City Human Rights Law, in order to demonstrate liability, a plaintiff need not establish that she or he was subjected to a "materially adverse" change to terms and conditions of employment, but only that she or he was subject to an unfavorable change or treated less well than other employees on the basis of a protected characteristic.
I. Factual and Procedural Background
The plaintiff began working as a police officer for the New York City Police Department (hereinafter NYCPD) on or about December 7, 1997. On September 27, 2004, she was promoted to the rank of sergeant, transferred, and assigned to work in Police Service Area (hereinafter PSA) 9, under the command of the defendant John Denesopolis, who was then a captain. Two years later, the plaintiff resigned.
In 2009, the plaintiff commenced this action against the City of New York and Denesopolis to recover damages for employment discrimination on the basis of gender and race in violation of the New York State Human Rights Law (Executive Law § 296) and the New York City Human Rights Law (Administrative Code of City of NY § 8-107). The complaint alleged discrimination under theories of a hostile work environment, disparate treatment, and constructive discharge.
The defendants moved for summary judgment dismissing the complaint, arguing, among other things, that the plaintiff was not subject to any adverse employment action, the acts complained of did not give rise to an inference of discrimination, and there were legitimate nondiscriminatory reasons for the conduct at issue. Viewing the facts in the light most favorable to [*2]the plaintiff (see Vega v Restani Constr. Corp., 18 NY3d 499, 503), the evidence submitted on the motion established the following.
The plaintiff, who identifies as African-American, was pregnant at the time that she became a sergeant and transferred to PSA 9 in September 2004. Prior to her promotion, she had worked in the Applicant Processing Unit, which did not involve patrol duties. During her entire time at PSA 9, the plaintiff was a probationary sergeant and did not obtain permanent sergeant status. As she was due to give birth shortly after her promotion and transfer, the plaintiff was not immediately assigned to a patrol squad. She was assigned to work as a desk officer. Any officer working in a restricted capacity who could not perform patrol functions would be assigned to the desk. The plaintiff did not have any objections to being a desk officer. At the plaintiff's first meeting with Denesopolis, at which another sergeant was present, Denesopolis stated that he was not very pleased that the plaintiff was there and that she was pregnant. He asked the plaintiff, "Oh, did you plan it this way?" The plaintiff worked for one to two weeks as a desk officer before taking her first maternity leave.
The plaintiff returned from leave in February or March 2005. She was assigned to patrol, with day tours and rotating days off. At some time in the following months, the plaintiff and her husband decided that they wanted to have another baby, and the plaintiff wanted to be off patrol. In September 2005, she saw the captain of the Applicant Processing Unit at a social function and discussed with him the possibility of transferring back to that unit as a sergeant. At the end of September, the plaintiff interviewed with a lieutenant and a sergeant in the administration office of the Applicant Processing Unit. The interview went well and the plaintiff was asked to supply a commanding officer's recommendation and the transfer paperwork. She had not yet spoken with her commanding officer, Denesopolis, about her desire to leave or told him that she was interviewing with another unit. The next day, Denesopolis called the plaintiff into his office and yelled at her for trying to go "behind his back" and "step on his toes." Notwithstanding that incident, Denesopolis did recommend the plaintiff for the transfer and timely completed the commanding officer's recommendation, which he gave directly to the plaintiff. The plaintiff, however, did not get the transfer. She was told that the Applicant Processing Unit wanted to hire her, but her paperwork was not received. Generally, it was the applicant's responsibility to put the paperwork together and send it to the desired place of transfer. Nonetheless, the plaintiff believed that Denesopolis had somehow interfered with her transfer paperwork because he was offended that she had not sought his permission prior to going on the interview.
The central command of PSA 9 was located in Pomonok. The plaintiff had been assigned to Pomonok. However, shortly after her interview with the Applicant Processing Unit, she was re-assigned within PSA 9 and transferred to the Ravenswood satellite office. The Ravenswood location was less desirable to the plaintiff, as it was further from her home. She asked Denesopolis to transfer her back to Pomonok, but he declined. During her assignment to Ravenswood, the plaintiff was generally on patrol. The role of desk officer would rotate among the patrol sergeants. Several times during her assignment at Ravenswood, the plaintiff was directed to perform the function of desk officer at Pomonok, but was still obligated to begin and end her shift at Ravenswood because that was her assignment. The plaintiff found this inconvenient.
In December 2005, the plaintiff announced to Denesopolis that she was pregnant again. According to the plaintiff, he "didn't look very happy," and said, "Oh, so you're pregnant again," which the plaintiff took negatively. Once the plaintiff announced her pregnancy, she was reassigned to Pomonok as a desk officer on the day tour. While on patrol, a sergeant's days off would rotate in such a way that approximately every two months, the sergeant would have a weekend off. When the plaintiff was assigned as desk officer at Pomonok for the duration of her pregnancy, she was given set days off, and those days were Tuesdays and Wednesdays. The plaintiff was unhappy that she would not have any weekends off, but she did not speak to Denesopolis about it or file a formal complaint or grievance.
At some time following the plaintiff's announcement of her second pregnancy at PSA 9, Denesopolis told another sergeant, in the plaintiff's presence, "I don't like women on this job because they have babies." At a meeting with other supervisors, Denesopolis referred to the plaintiff as "Sergeant do nothing" and "an empty suit," which the plaintiff understood to be because she was pregnant and unable to go out on patrol. At that same meeting, Denesopolis stated that he was "not going to hold [the plaintiff's] hand and sing Kum Ba Yah." Denesopolis also made this comment one other time directly to the plaintiff concerning a command log entry she had made. The plaintiff [*3]thought the comment was racially derogatory because the song had African-American origins. She also acknowledged, however, that the comment could refer to a coddling type of manner.
As desk officer, the plaintiff found it difficult to obtain relief to cover her breaks. Sergeants are not assigned specific breaks. If a sergeant is performing the duty of desk officer, she or he must ask another sergeant for coverage if she or he needs a break. The plaintiff believed that the other sergeants would not come in from patrol to relieve her because they knew that Denesopolis did not want them to come inside from patrol duty. The plaintiff acknowledged that a captain would not normally assign sergeants to cover the desk officer. However, she thought that once Denesopolis became aware that the plaintiff was not getting relief, he should have assigned someone to cover breaks for her. She complained to him, and he told her to "suck it up."
Although Denesopolis never disciplined the plaintiff in any manner, the plaintiff felt that he was unnecessarily critical of her work, telling her, "You need to be a Sergeant" and "You need to do your job," and that he would give her contradictory directions on different days. He would reprimand her in front of peers, subordinates, and civilians, and assign her difficult tasks.
In March 2006, the plaintiff was put on bed rest, which she attributed to the stress of her job. She was on sick leave until May 2006, at which time she went on maternity leave. When her maternity leave expired in July, she took annual leave. The plaintiff did not have a conversation with Denesopolis regarding how long she could stay out using annual leave, but she understood that she could continue to stay out so long as she had annual leave and she was not needed at PSA 9. She would submit the paperwork weekly, and her leave requests were approved.
On September 14, 2006, Sergeant Angelos Marketos was told that the command was having difficulty reaching the plaintiff, who had been out on leave for approximately six months. Marketos was directed to go to the plaintiff's house. He knocked on the door, rang the bell, looked for lights and movement, and, upon seeing none, left. Marketos reported to command that there was a "for sale" sign on the home. The plaintiff's neighbor called her on the telephone and told her that the police had come to her home and a notice was left on her door. The plaintiff called the police department and was told that she was to report for duty on the midnight shift immediately, and if she did not comply, she would be suspended for insubordination or designated AWOL. The plaintiff was upset. She could not work the midnight shift because her husband worked nights and they had three small children. She believed that this was Denesopolis's doing.
At an April 7, 2009, deposition, the plaintiff testified that she called the command and spoke with the desk officer and a lieutenant, but did not speak with Denesopolis or anyone in roll call. She further testified that the same day that Sergeant Marketos came to her house, she gathered her firearm and shield, went to Pomonok, and declared that she was "vesting out" and "leaving." The plaintiff submitted paperwork to end her employment with the NYCPD that day. By contrast, at a June 1, 2011, deposition, the plaintiff testified that she was away from home on the day that Marketos went to her house and that, after her neighbor called her, she returned within 48 hours to find a notice on her door that she was to report to the midnight patrol on a certain day. She further testified that she called roll call and spoke with someone there who advised her that "the captain" had made the shift assignment. She also testified that she spoke with "the captain" and asked why she was being put on the midnight shift and he replied, "That's your shift." Following that conversation, the plaintiff went to the command and resigned. The following month, she moved to Texas.
In his deposition, Denesopolis denied making any derogatory comments to the plaintiff. As to the plaintiff's assignments, Denesopolis stated that he would have kept the plaintiff on patrol, with rotating days off, if he could have, but when she was assigned to the desk, he had determined her schedule based on the coverage that the department needed at that time. Regarding breaks for a desk officer, Denesopolis testified that breaks were not assigned and sergeants had to ask one another for help. Before the plaintiff took her second maternity leave, she did not discuss with Denesopolis for how long she would be out, but he approved all of her requests for leave. They also did not discuss what the plaintiff's shift assignment would be when she returned. Denesopolis believed that the operations coordinator or someone in roll call sent Sergeant Marketos to the plaintiff's home.
In support of their motion for summary judgment, the defendants argued, among other things, that the plaintiff was unable to demonstrate a prima facie case of discrimination because she was not subject to any adverse employment action and the claimed discriminatory acts did not occur under circumstances that give rise to an inference of discrimination. The defendants also argued that [*4]the plaintiff was not subject to a hostile work environment or constructively discharged. In opposition, the plaintiff argued that there were triable issues of fact as to each of her claims.
In an order entered January 4, 2016, the Supreme Court, inter alia, granted the defendants' motion for summary judgment dismissing the complaint. As relevant to this appeal, the court found that the plaintiff's allegations were insufficient to constitute any materially adverse employment action, the harassing conduct alleged was not sufficiently severe and pervasive as to alter the conditions of her employment, and the conduct alleged was insufficient to support a claim for constructive discharge. The plaintiff appeals.
II. Discussion
Both the New York State Human Rights Law (hereinafter the State Human Rights Law) and the New York City Human Rights Law (hereinafter the City Human Rights Law) make it unlawful for an employer or an employee or agent thereof, to discriminate, as relevant here, against an individual "in compensation or in terms, conditions or privileges of employment," or to discharge such a person from employment, on the basis of the individual's race or gender (Executive Law § 296[1][a]; Administrative Code of City of NY § 8-107[1][a][3]). Discrimination on the basis of pregnancy is a form of gender discrimination (see Chauca v Abraham, 30 NY3d 325, 330 n 1; Elaine W. v Joint Diseases N. Gen. Hosp., 81 NY2d 211, 216). Although the state and city laws are worded similarly, in 2005, the New York City Council enacted the Local Civil Rights Restoration Act of 2005 (Local Law No. 85 [2005] of City of NY [hereinafter Restoration Act]) in order to clarify that claims under the City Human Rights Law are to be construed separately and independently from their state and federal counterparts (Restoration Act § 1). The City Council's perception at that time was that the City Human Rights Law "ha[d] been construed too narrowly to ensure protection of the civil rights of all persons covered by the law" (Restoration Act § 1). As part of the Restoration Act, the City Council amended Administrative Code § 8-130 to expressly provide that the provisions of the City Human Rights Law "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof," regardless of how the comparable state and federal laws had been construed (Administrative Code of City of NY § 8-130[a]). The effect of the Restoration Act is that the courts must construe all provisions of the City Human Rights Law "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477-478).
In 2016, the City Council made further amendments to the City Human Rights Law, in order "to provide additional guidance for the development of an independent body of jurisprudence for the New York city human rights law that is maximally protective of civil rights in all circumstances" (Local Law No. 35 [2016] of City of NY § 1). The City Council noted that "some judicial decisions have correctly understood and analyzed the requirement of section 8-130 . . . that all provisions of the New York City Human Rights Law be liberally and independently construed" (Local Law No. 35 § 1). Section 8-130 was amended, inter alia, to add a provision directing that exceptions and exemptions "shall be construed narrowly in order to maximize deterrence of discriminatory conduct" (Administrative Code of City of NY § 8-130[b]), and pointing courts to three cases "that have correctly understood and analyzed the liberal construction requirement . . . and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of this title"[FN1] (Administrative Code of City of NY § 8-130[c], citing Albunio v City of New York, 16 NY3d 472; Bennett v Health Mgt. Sys., Inc., 92 AD3d 29, and Williams v New York City Hous. Auth., 61 AD3d 62).
Here, the Supreme Court analyzed the plaintiff's state and city claims together under the principles established for state law claims. The court erred in failing to conduct a separate and independent analysis of the plaintiff's city law claims, and in failing to apply the requisite liberal construction of the City Human Rights Law. In light of the legislative mandate to broadly construe [*5]the City Human Rights Law in favor of discrimination plaintiffs, we separately analyze the plaintiff's City Human Rights Law claims from her State Human Rights Law claims.
A. Adverse Employment Action
One way in which a plaintiff can establish discrimination in the terms, conditions, or privileges of employment is by showing that she or he was subject to an adverse employment action. Under the State Human Rights Law, a plaintiff alleging such discrimination must show that (1) she or he is a member of a protected class, (2) she or he is qualified to hold the position, (3) she or he suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination (see Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO, 6 NY3d 265, 270; Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305; Ferrante v American Lung Assn., 90 NY2d 623, 629).
Here, the plaintiff identifies four adverse employment actions, which she alleges she suffered due to race and gender discrimination: (1) her assignment to the undesirable Ravenswood satellite office from the end of September 2005 to December 2005, (2) having fixed Tuesdays and Wednesdays off from December 2005 to March 2006, instead of a rotating schedule that would afford her the occasional weekend day off, (3) not being assigned relief for her breaks while working as a desk officer, and (4) the September 2006 assignment to the midnight shift.
To prevail on a motion for summary judgment dismissing a cause of action alleging discrimination under the State Human Rights Law, a defendant "must demonstrate either plaintiff's failure to establish every element of intentional discrimination, or, having offered legitimate, nondiscriminatory reasons for their challenged actions, the absence of a material issue of fact as to whether their explanations were pretextual" (Forrest v Jewish Guild for the Blind, 3 NY3d at 305; see Furfero v St. John's Univ., 94 AD3d 695, 697; Ehmann v Good Samaritan Hosp. Med. Ctr., 90 AD3d 985, 985-986). We agree with the Supreme Court's determination that the defendants met this burden with respect to the causes of action under the State Human Rights Law.
Initially, it is undisputed that the plaintiff is a member of protected classes on the basis of her race and gender, and that she was qualified for her position. However, the plaintiff's evidence, even drawing all inferences in her favor, fails to establish that she suffered an adverse employment action within the meaning of the State Human Rights Law. Under the State Human Rights Law, at least at the relevant time,[FN2] to be actionable, the adverse employment action must be "a materially adverse change in the terms and conditions of employment" (Forrest v Jewish Guild for the Blind, 3 NY3d at 306). Such change must be " more disruptive than a mere inconvenience or an alteration of job responsibilities,'" such as " a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities" (id., quoting Galabya v New York City Bd. of Educ., 202 F3d 636, 640 [2d Cir]). None of the actions identified by the plaintiff constitutes a materially adverse change in the terms and conditions of employment under the State Human Rights Law, as they did not involve any demotion, decrease in salary, loss of privilege, diminution of responsibilities, or loss of benefits (see Forrest v Jewish Guild for the Blind, 3 NY3d at 307; Ragoo v New York City Taxi & Limousine Commn., 132 AD3d 562, 562; Silvis v City of New York, 95 AD3d 665; Matter of Block v Gatling, 84 AD3d 445; Ponterio v Kaye, 25 AD3d 865, 869).
The defendants assert that the City Human Rights Law also requires a plaintiff to establish a "materially adverse" change to the terms and conditions of employment before a plaintiff can establish liability. We disagree. The legislative mandate is clear that all provisions of the City Human Rights Law must be construed broadly in favor of discrimination plaintiffs and courts must apply an independent liberal construction in order to accomplish the broad purposes of the City Human Rights Law to maximize deterrence of discriminatory conduct (see Administrative Code of City of New York § 8-130[b], [c]; Albunio v City of New York, 16 NY3d at 477; Bennett v Health Mgt. Sys., Inc., 92 AD3d at 34; Williams v New York City Hous. Auth., 61 AD3d at 65-69). With these goals in mind, we find that an adverse employment action need not be material in order to be actionable under the City Human Rights Law.
The "materially adverse" standard effectively acts as a bar under which an employee [*6]may suffer a host of adverse employment actions due to discrimination, but have no recourse under the discrimination law if the discriminatory conduct did not result in a loss of wages, title, benefits, or responsibilities. This result is entirely inconsistent with the broad remedial purposes of the City Human Rights Law to eradicate discriminatory conduct in the workplace. In contrast to the materially adverse standard, a rule by which liability is determined simply by the existence of adverse differential treatment furthers the City Human Rights Law's deterrent purposes. Indeed, in the context of retaliation claims, the City Council expressly provided that "[t]he retaliation or discrimination complained of . . . need not result in . . . a materially adverse change in the terms and conditions of employment" so long as the retaliatory or discriminatory acts complained of are reasonably likely to deter a person from engaging in the protected activity (Administrative Code of City of NY § 8-107[7]). When considering this standard under the City Human Rights Law, the Court of Appeals recognized, as adverse employment actions, a change in the hours of work or geographical assignments, being shunned or excluded from meetings, and being transferred to a "less desirable" job (Albunio v City of New York, 16 NY3d at 476). This is a recognition that any unfavorable employment action arising from an invidious discriminatory intent is prohibited by the law, and the City Human Rights Law requires that unlawful discrimination play no role in any employment decision (see Williams v New York City Tr. Auth., 171 AD3d 990, 993; Johnson v Department of Educ. of City of N.Y., 158 AD3d 744, 746; Singh v Covenant Aviation Sec., LLC, 131 AD3d 1158, 1161).
We hold that under the City Human Rights Law, in order to demonstrate liability, a plaintiff need not establish that she or he was subjected to a "materially adverse" change to terms and conditions of employment, but only that she or he was subject to an unfavorable change or treated less well than other employees on the basis of a protected characteristic (see Harrington v City of New York, 157 AD3d 582, 584; Ji Sun Jennifer Kim v Goldberg, Weprin, Finkel, Goldstein, LLP, 120 AD3d 18, 26; Short v Deutsche Bank Sec., Inc., 79 AD3d 503, 505-506).
Applying this standard to the plaintiff's claims, we find that each of the four adverse employment actions alleged by the plaintiff constitutes actionable unfavorable treatment under the City Human Rights Law—a change in geographical assignment, a change to less favorable days off, not receiving relief in order to take breaks, and a change to a less favorable work schedule. However, we further find that the defendants demonstrated their prima facie entitlement to judgment as a matter of law dismissing the adverse employment causes of action by establishing the absence of intentional discrimination or legitimate, nondiscriminatory reasons for their challenged conduct (see Cadet-Legros v New York Univ. Hosp. Ctr., 135 AD3d 196, 200; Singh v Covenant Aviation Sec., LLC, 131 AD3d at 1159).
Turning first to the plaintiff's claim with respect to her transfer to Ravenswood, viewing the evidence in the light most favorable to the plaintiff and resolving all reasonable inferences in her favor, there is no evidentiary route that could allow a jury to find that the transfer was motivated by discrimination based on the plaintiff's gender or race. By the plaintiff's own account, the transfer to Ravenswood was a direct consequence of her failure to inform Denesopolis that she was interviewing for a position in another department and his feelings that she was trying to go behind his back or step on his toes. Regardless of whether that was a proper reason to transfer the plaintiff to the undesirable work location, the circumstances do not give rise to an inference of unlawful discrimination as asserted here. The plaintiff has alleged no facts from which a jury could find that the transfer was based on the plaintiff's race or gender. Of significance, as soon as the plaintiff informed Denesopolis of her second pregnancy, she was transferred back to the more desirable location of Pomonok. The alleged adverse action did not occur under circumstances giving rise to an inference of discrimination.
Second, after the plaintiff was transferred back to Pomonok for the duration of her second pregnancy, she was given the fixed days off of Tuesdays and Wednesdays, instead of the rotating schedule of the patrol squad, which would provide for a weekend day off approximately every two months. The plaintiff was on this schedule for approximately three months, thereby missing one or two potential weekends. Denesopolis testified that when he assigned the plaintiff to the desk, he determined her schedule based upon the department's coverage needs at that time. The defendants thus met their burden of demonstrating a legitimate nondiscriminatory reason for assigning the plaintiff fixed Tuesdays and Wednesdays off. In opposition, the plaintiff failed to raise a triable issue of fact by coming forward with evidence that the stated reasons were pretextual or that discrimination was one of the motivating factors for the conduct at issue (see Hamburg v New York [*7]Univ. Sch. of Medicine, 155 AD3d 66, 73; Bennett v Health Mgt. Sys., Inc., 92 AD3d at 39).
Third, the plaintiff complained that she was not given relief for breaks while assigned as a desk officer. The evidence submitted on the motion, however, established that no desk officer was assigned relief for breaks and it was incumbent on the sergeant assigned to that task to get coverage from another sergeant. The evidence, thus, established that the plaintiff was not treated differently from similarly situated employees and the circumstances did not give rise to an inference of discrimination.
Finally, the plaintiff was directed to return to work from leave and to report for duty on the midnight shift, which was a hardship for the plaintiff in light of the fact that she was a parent of three young children and her husband worked overnight. The evidence before the Supreme Court, however, established that the plaintiff was a probationary sergeant who had worked on patrol, on a day shift, for only nine months, until December 2005. It is undisputed that the plaintiff's ability to remain out on annual leave was dependent on the coverage needs of PSA 9, and that the needs of the police department require around-the-clock patrol coverage. In addition, the defendants submitted Denesopolis's testimony that he and the plaintiff had never discussed what her shift assignment would be upon her return from leave. The defendants also submitted the testimony of other sergeants which established that patrol sergeants were routinely placed on different shifts, including the midnight shift, in accordance with the needs of the command, without regard to their personal preferences, and often with very little advance notice. The evidence established that the plaintiff was not treated differently from similarly situated employees and the circumstances did not give rise to an inference of discrimination. The plaintiff failed to raise a triable issue of fact in opposition.
Accordingly, the defendants were entitled to summary judgment dismissing the cause of action premised on an adverse employment action under the City Human Rights Law.
B. Hostile Work Environment
Another way in which a plaintiff may establish discrimination in the "terms, conditions, and privileges of employment" is by showing that she or he was subject to a hostile work environment (see Williams v New York City Hous. Auth., 61 AD3d at 75). Under the State Human Rights Law at the relevant time, in order to establish that a hostile work environment existed, a plaintiff had to demonstrate that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (Forrest v Jewish Guild for the Blind, 3 NY3d at 310 [internal quotation marks omitted])[FN3]. We agree with the Supreme Court's determination that the defendants met their burden of establishing that the conduct at issue was not sufficiently severe or pervasive to establish a hostile work environment under the State Human Rights Law.
The plaintiff's allegations of gender discrimination are that Denesopolis expressed displeasure in September 2004, with her initial assignment to his unit within weeks before going out on maternity leave, and again in December 2005, upon learning of her second pregnancy. In addition, the plaintiff averred that Denesopolis once stated that he did not "like women on this job because they have babies," he once referred to the plaintiff as "Sergeant do nothing" and "an empty suit," he told her that she needed to "be a Sergeant" and "do [her] job," and he had reprimanded her in front of others. Pressed at her deposition to identify the incidents in which she was reprimanded, the plaintiff identified three incidents in which Denesopolis was unsatisfied with the way that she had handled a situation as a sergeant and yelled at her. She acknowledged, however, that he did this to others and that he would "just kind of blow up" when he got upset about "things related to the Command." These isolated comments and incidents, some of which are not apparently gender-related, are not sufficiently severe or pervasive to constitute a hostile work environment under the State Human Rights Law (see Ji Sun Jennifer Kim v Goldberg, Weprin, Finkel, Goldstein, LLP, 120 AD3d at 26; Chin v New York City Hous. Auth., 106 AD3d 443, 445).
Similarly, the plaintiff's claim of race discrimination is predicated on a single comment that Denesopolis was not going to hold the plaintiff's hand and sing "Kum Ba Yah." "While some language is unmistakably reflective of the presence of race or other protected . . . status in the mind of the speaker, in many other cases meaning is context-dependent" (Cadet-Legros v New York Univ. Hosp. Ctr., 135 AD3d at 204-205). The subject comment is not unmistakably reflective of the presence of race, and, as the plaintiff conceded, may refer to a coddling type of behavior. The comment appeared in the context in which Denesopolis expressed a lack of confidence in the plaintiff's ability to fulfill the role of a sergeant, and that she needed more "hand holding" than he expected from his sergeants. The plaintiff "offered no evidence from which to infer that the expression [was] imbued with racial meaning in contemporary parlance" (id. at 205). Moreover, even assuming the comment could be understood to be racially derogatory, the single comment was not sufficiently severe or pervasive to constitute a hostile work environment under the State Human Rights Law.
Under the City Human Rights Law, however, the questions of severity and pervasiveness "are applicable to [the] consideration of the scope of permissible damages, but not to the question of underlying liability" (Williams v New York City Hous. Auth., 61 AD3d at 76; see Administrative Code of City of NY § 8-130[c]; Nelson v HSBC Bank USA, 87 AD3d 995, 999). Under the City Human Rights Law, liability for a hostile work environment/harassment cause of action is proven where a plaintiff establishes that she or he "was treated less well than other employees because of the relevant characteristic" (Nelson v HSBC Bank USA, 87 AD3d at 999; see Williams v New York City Hous. Auth., 61 AD3d at 78). "At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred" (Williams v New York City Hous. Auth., 61 AD3d at 78). Still, "the broader purposes of the City [Human Rights Law] do not connote an intention that the law operate as a general civility code'" (id. at 79, quoting Oncale v Sundowner Offshore Servs., Inc., 523 US 75, 81), and a defendant can avoid liability by establishing, as an affirmative defense, "that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences'" (Williams v New York City Hous. Auth., 61 AD3d at 80; see Nelson v HSBC Bank USA, 87 AD3d at 999).
Under the City Human Rights Law, a court should award summary judgment dismissing a cause of action alleging a hostile work environment only if it can be said, as a matter of law, that the conduct complained of was "truly insubstantial" and cannot be said to fall within "the broad range of conduct . . . between severe or pervasive' on the one hand and a petty slight or trivial inconvenience' on the other" (Williams v New York City Hous. Auth., 61 AD3d at 80; see Hernandez v Kaisman, 103 AD3d 106, 114-115). A single comment "being made in circumstances where that comment would, for example, signal views about the role of women in the workplace" may be actionable under the City Human Rights Law (Williams v New York City Hous. Auth., 61 AD3d at 80 n 30; see Hernandez v Kaisman, 103 AD3d at 115). Where the alleged discriminatory conduct in question represents a " borderline situation[ ],'" the determination should be left to the trier of fact (Williams v New York City Hous. Auth., 61 AD3d at 80, quoting Gallagher v Delaney, 139 F3d 338, 342 [2d Cir]).
Upon conducting an independent review of the cause of action alleging a racially hostile work environment under the City Human Rights Law, we find that the defendants established their prima facie entitlement to judgment as a matter of law dismissing that cause of action. As discussed above, the plaintiff alleges only a single comment which is not facially racially derogatory. Even if the comment could be construed to have such a negative connotation, the surrounding circumstances do not give rise to anything more than a "petty slight" or "trivial inconvenience."
We reach a different conclusion, however, upon conducting the requisite independent analysis of the cause of action alleging a hostile work environment under the City Human Rights Law based on gender. The alleged comment by Denesopolis, that he did not "like women on this job because they have babies," plainly expresses a view of the role of women in the workplace. Considering the totality of the circumstances, which include the plaintiff's testimony that Denesopolis expressed displeasure upon learning of her transfer to his unit as a pregnant woman, and then again at her second pregnancy, we cannot say that this is a "truly insubstantial case" as a matter of law. In addition, while it might be inferred that the incidents in which Denesopolis publicly reprimanded the plaintiff and referred to her as an "empty suit" and "Sergeant do nothing" were related to deficiencies in her performance as a sergeant, on the defendants' motion for summary [*8]judgment, we must view the facts in the light most favorable to the plaintiff. A jury could agree with the plaintiff that the conduct was based upon her pregnancies and conclude that the plaintiff was subject to a workplace in which she was treated less well than others because of her gender. Accordingly, the cause of action alleging gender discrimination on a theory of a hostile work environment under the City Human Rights Law must be reinstated.
C. Constructive Discharge
The plaintiff contends that she was constructively discharged when she was ordered to return to work and report to duty on the midnight shift, a shift she could not fulfill considering her personal circumstances. An employee is constructively discharged when her or his employer, rather than discharging the plaintiff directly, deliberately created working conditions so intolerable that a
reasonable person in the plaintiff's position would have felt compelled to resign [FN4] (see Short v Deutsche Bank Sec., Inc., 79 AD3d at 504; Nelson v HSBC Bank USA, 41 AD3d 445, 447). The plaintiff was a probationary sergeant at a command whose primary function was patrol duties. On their motion for summary judgment, the defendants established that all sergeants in the command were expected to fulfill various shifts in accordance with the needs of the command, and a sergeant's shift could change with little notice. The defendants also established that the plaintiff was not entitled to any particular shift, and her extended leave was contingent on the needs of the command. Viewing the evidence in the light most favorable to the plaintiff, her complaints do not demonstrate an intolerable work environment that would lead a reasonable person in that position to feel compelled to resign. The evidence demonstrates that the plaintiff had decided that she no longer wished to be on patrol, and the moment she was directed to return to work, she simply resigned (see Short v Deutsche Bank Sec., Inc., 79 AD3d at 504). In opposition to the defendants' prima facie showing, the plaintiff failed to raise a triable issue of fact that would prevent the granting of summary judgment dismissing the causes of action predicated on a constructive discharge theory.
Accordingly, the order is modified, on the law, by deleting the provision thereof granting that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for gender discrimination based upon a hostile work environment pursuant to Administrative Code of the City of New York § 8-107, and substituting therefor a provision denying that branch of the motion; as so modified, the order is affirmed insofar as appealed from.
SCHEINKMAN, P.J., DILLON and LASALLE, JJ., concur.
ORDERED that the order is modified, on the law, by deleting the provision thereof granting that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for gender discrimination based upon a hostile work environment pursuant to Administrative Code of the City of New York § 8-107, and substituting therefor a provision denying that branch of the motion; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements.
ENTER: Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1:We note that the State Human Rights Law has been amended to also require an independent liberal analysis to accomplish remedial purposes, as well as narrow construction of exceptions and exemptions (see Executive Law § 300, as amended by L 2019, ch 160, § 6). However, that amendment was made to be effective August 12, 2019 (see L 2019, ch 160, § 16), and only applies to claims filed after the effective date (see L 2019, ch 160, § 16[d]). Since the plaintiff's claims were filed prior to the amendments, we analyze her state law claims under the standard as it existed at the time her claims were filed.

Footnote 2:We express no opinion as to whether the changes to the State Human Rights Law impact the materiality standard of an adverse employment action. We merely recognize that the changes to the State Human Rights Law could impact claims brought after the law's effective date.

Footnote 3:The State Human Rights Law was amended to provide that harassment is actionable "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims," and the plaintiff need demonstrate only that she or he was subjected to "inferior terms, conditions or privileges of employment" (Executive Law § 296 [1][h]). This amendment, however, only applies to claims filed after the amendment's effective date of October 11, 2019 (see L 2019, ch 160, § 16[b], [d]).

Footnote 4:We recognize that the appellate courts have not yet explored the contours of a constructive discharge claim using the enhanced liberal construction analysis of the City Human Rights Law. Given the limited allegations of the plaintiff here, we have no occasion to explore those contours on this appeal or consider the degree of difficulty or unpleasantness of working conditions needed to sustain a claim under the City Human Rights Law.